**Robert Alan QUEEMAN, Appellant**

v.

**The STATE of Texas**

**NO. PD-0215-16**

Court of Criminal Appeals of Texas.

Delivered: June 14, 2017

James Gerard McDermott II, Thompson Salinas and McDermott, LLP, Austin, TX, for appellant.

John R. Messinger, Assistant State Prosecuting Attorney, Stacey Soule, Austin, TX, for the State.

## OPINION

Alcala, J., delivered the opinion for a unanimous Court.

In reviewing the sufficiency of the evidence to support this criminally negligent homicide judgment, we address whether a death caused by two driving errors—the failure to control speed and the failure to maintain a proper distance between vehicles—proves a gross deviation from the standard of care that an ordinary person would exercise under the circumstances. Robert Alan Queeman, appellant, was convicted of criminally negligent homicide after failing to prevent his van from colliding with another vehicle, which resulted in the death of a passenger in the other vehicle. The court of appeals reversed the jury's verdict of guilt after finding that the evidence was legally insufficient to sustain the conviction. We agree with the court of appeals's ultimate conclusion that the evidence in this case is legally insufficient to establish criminally negligent homicide because the evidence presented at trial does not show that appellant's failure to maintain a safe driving speed and keep a proper distance from other vehicles was a gross deviation from the standard of care that an ordinary driver would exercise under all the circumstances as viewed from appellant's standpoint at the time of his conduct. We affirm the judgment of the court of appeals.

## I. Background

Appellant was driving eastbound on a two-lane highway when his van rear-ended an SUV that was making a left turn off the highway onto an intersecting street. The collision caused the SUV to roll over into the westbound lane where it collided with an oncoming truck before coming to a stop upside down approximately fifty feet from the initial point of impact. Appellant's vehicle traveled approximately another 130-150 feet before coming to a stop. The SUV was occupied by three women: Maria del Rosario Luna was driving, Josefa Payne was in the front passenger seat, and Olga Deleon was in the back seat. Olga Deleon died as a result of injuries sustained in the collision.

Appellant was later charged in a two-count indictment for manslaughter and criminally negligent homicide.[1] *See* Tex. Penal Code §§ 19.04, 19.05. A jury acquitted him of manslaughter but found him

---

1. The criminally negligent homicide count in the indictment alleged,

 [Appellant did] cause the death of an individual, Olga Deleon, by criminal negligence, to wit: by operating a motor vehicle on highway 90 in Kinney County, Texas while failing to maintain a safe operating speed and keep a proper distance, together with the disregard of the risk of death, caused the vehicle operated by Robert Alan Queeman to strike Olga Deleon and did then and there and thereby cause the said Olga Deleon to be killed.

guilty of criminally negligent homicide. Subsequently, the trial court sentenced him to eighteen months' confinement in a state jail facility.

At trial, Luna testified that she did not remember the details surrounding the accident except that she recalled that she and her passengers were driving home, which meant that she likely would have been making a left turn off the highway where the accident occurred. She could not recall whether her vehicle was stopped or still moving at the moment of impact. She stated that she believed she used her turn signal but could not recall for certain. However, in a statement given to investigators several days after the accident, she stated that she did not use her turn signal.

Appellant's theory about the cause of the accident, which was introduced through Trooper Welch's testimony, was that appellant accidentally struck the SUV because it suddenly slowed down to make a left turn without using its turn signal. Appellant claimed that he was driving approximately 36 to 37 miles per hour, which was within the 40 miles-per-hour speed limit, at the time of the collision. Appellant maintained that, when he saw the SUV, he attempted to avoid hitting it but was unable to completely evade it. Appellant suggested that this corrective action resulted in the front-left side of his vehicle striking the right-rear side of the SUV.

Trooper Welch, who was in charge of the accident investigation, issued citations to Luna and appellant for their roles in the collision. Welch issued Luna a traffic ticket for failing to use her turn signal. He cited appellant for failure to maintain control of his speed but did not cite him for speeding. *See* TEX. TRANSP. CODE § 545.351. Additionally, Welch did not suspect appellant was intoxicated or impaired before the accident.

In his investigation, Welch determined that the SUV was stopped or nearly stopped at the time of the collision, that the SUV's brake lights were illuminated, and that appellant did not brake until just before or at the time that he struck the SUV.

Rejecting appellant's claim about his speed at the time of the collision, Welch determined that appellant was traveling "significantly" faster than 36 to 37 miles per hour. Welch opined that appellant was exceeding the 40 miles-per-hour speed limit. Welch made that determination based on his calculation of appellant's post-impact speed, which he concluded was approximately 34 miles per hour based on the length of yaw marks left by appellant's vehicle.[2] This calculation required an assumption concerning the coefficient of friction between the tires and pavement because Welch did not have the necessary training to measure the actual friction coefficient for the formula. Welch testified that varying the coefficient of friction by

---

**2.** Welch explained the difference between a skid mark and a yaw mark by stating,

Technically a skid mark is a mark left from braking. When you lock up the tires, lock up the brakes on your vehicle, a deer runs out in front of you or whatever happens, you lock up the brakes, you are going to skid basically in a straight line. Whatever way the wheels are pointed you are going to skid·in that direction, and those marks are going to be solid black marks, just going to be solid black straight lines. Those are "skid marks." A yaw mark, on the other hand, when a tire is traveling, basically what is happening is, this tire is traveling in two directions at the same time. Essentially— think of it as you are going to make a sharp curve. Well, you are going too fast to make that curve, so you are going forward and you are trying to turn at the same time. In doing that the tire will leave what is called a yaw mark on the pavement, and that yaw mark is going to be in an arc, because you are trying to turn.

ten percent changed the answer nominally between 32 miles per hour for a friction coefficient of sixty percent and 37 miles per hour for a friction coefficient of eighty percent. Welch stated that the coefficient of friction depends on a number of variables, including the weather and the pavement or surface type, but that his baseline assumption of a seventy-percent friction coefficient for dry asphalt on a clear day is "pretty well accepted." Welch indicated that the collision occurred on a clear, dry day. Furthermore, Welch opined that, based on his experience, appellant's vehicle would have been substantially slowed by a collision with a stationary car, like Luna's SUV.[3] On the other hand, Welch conceded that he had no way of knowing specifically appellant's actual pre-accident speed.[4]

On appeal, appellant challenged the sufficiency of the evidence to support his conviction. *Queeman v. State*, 486 S.W.3d 70 (Tex. App.—San Antonio 2016). The court of appeals reversed the trial court's judgment and rendered a judgment of acquittal. *Id.* at 71. The court of appeals found that the evidence presented could not have provided the jury a basis from which to reasonably infer that appellant was traveling at an "excessive rate of speed." *Id.* at

77. The court of appeals noted that Welch could not quantify appellant's pre-impact speed and also did not cite appellant for speeding. *Id.* Therefore, the court of appeals found that any inference by the jury that appellant was traveling at an excessive speed would be impermissible speculation. *Id.* (citing *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012); *Hooper v. State*, 214 S.W.3d 9, 15-16 (Tex. Crim. App. 2007)). Additionally, the evidence that appellant's vehicle hit Luna's SUV at an angle rather than straight from behind indicated that appellant tried to swerve to avoid the accident. *Id.* Furthermore, the court of appeals found that the evidence adduced at trial "[did] not show that [appellant] was engaged in any criminally culpable risk-creating conduct—e.g., dangerous speeding, racing, failure to obey traffic signals, or any other misconduct that created or contributed to a 'substantial and unjustifiable' risk of death." *Id.* (quoting *People v. Boutin*, 75 N.Y.2d 692, 556 N.Y.S.2d 1, 555 N.E.2d 253, 255-56 (1990)). Nor did the evidence establish that appellant engaged in other types of "serious, blameworthy conduct like distracted driving due to cell phone use and an abrupt, aggressive, unsafe lane change" or

---

3. The record shows that Welch testified that appellant was exceeding the speed limit and driving significantly faster than 36 or 37 miles per hour:

> [Welch] [T]he average person may look at that, and they think well, that's what [appellant] told you, [that appellant was traveling] 36 or 37 miles per hour, maybe that's accurate. Well, at the time, you know, I had been investigating accidents for four years.... You know, I worked my fair share of accidents, and to me, if [appellant] was driving 36 or 37 miles an hour prior to impact, the speed that—after he lost all of that momentum, the speed would have been a lot lower. That's my own personal ... formulation, because he's going to lose a lot of momentum. You hit a stationary object, you are

going to lose your momentum, so what that basically told me as an investigator was that [appellant] was traveling more than 36 or 37 miles an hour.

\* \* \*

> [Prosecutor:] Significantly more?
> [Welch:] Yes.

\* \* \*

> [Prosecutor:] Is it safe to say that [appellant] was exceeding 40 miles an hour?
> [Welch:] Yes, sir.

4. During cross-examination, appellant's counsel asked, "So there is no way for you to actually mathematically ascertain, based upon your training, how fast [appellant] was going on Highway 90 that day [prior to impact]?" Welch answered "No, I don't know. I don't have any way of knowing that."

intoxicated driving. *Id.* Instead, the evidence " 'establishe[d] only that [appellant] inexplicably failed to see [Luna's] vehicle until he was so close that he could not prevent the collision.' " *Id.* (quoting *Boutin,* 556 N.Y.S.2d 1, 555 N.E.2d at 256). Thus, the court of appeals found the evidence legally insufficient to support appellant's conviction. *Id.*

In its petition for discretionary review, the State challenges the court of appeals's judgment on two grounds. It asks,

(1) Is failing to maintain a safe speed and keep a proper distance the sort of "unexplained failure" that this Court suggested in *Tello v. State*, 180 S.W.3d 150 (Tex. Crim. App. 2005), would be unworthy of criminal sanction?

(2) Did the court of appeals ignore basic rules of sufficiency review when it disregarded evidence that supported the verdict and drew inferences contrary to those presumably drawn by the jury?

## II. Analysis

After describing the applicable law, we address the State's two arguments. We begin with the State's second ground that asserts that the court of appeals's analysis was flawed by failing to view the facts in a light most favorable to the jury's verdict. After that, we address the State's first ground that the court of appeals erred by deciding that no rational jury could decide that these facts establish criminal negligence.

### A. Applicable Law for Establishing Criminal Negligence

When reviewing the sufficiency of the evidence, we view the evidence "in the light most favorable to the verdict and determine whether, based on the evidence and reasonable inferences therefrom, a ra-

tional juror could have found the essential elements of the crime beyond a reasonable doubt." *Anderson v. State*, 416 S.W.3d 884, 888 (Tex. Crim. App. 2013) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). The jury is the sole judge of the credibility of witnesses and the weight to be given to their testimonies, and the reviewing court must not usurp this role by substituting its own judgment for that of the jury. *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). The duty of the reviewing court is simply to ensure that the evidence presented supports the jury's verdict and that the State has presented a legally sufficient case of the offense charged. *Id.* When the reviewing court is faced with a record supporting contradicting inferences, the court must presume that the jury resolved any such conflicts in favor of the verdict, even if not explicitly stated in the record. *Id.* "Under this standard, evidence may be legally insufficient when the record contains either no evidence of an essential element, merely a modicum of evidence of one element, or if it conclusively establishes a reasonable doubt." *Britain v. State*, 412 S.W.3d 518, 520 (Tex. Crim. App. 2013) (citing *Jackson*, 443 U.S. at 320, 99 S.Ct. 2781).

A legally sufficient showing of criminally negligent homicide requires the State to prove that (1) the defendant's conduct caused the death of an individual; (2) the defendant ought to have been aware that there was a substantial and unjustifiable risk of death from his conduct; and (3) his failure to perceive the risk constituted a gross deviation from the standard of care an ordinary person would have exercised under like circumstances. *Montgomery*, 369 S.W.3d at 192-93; *see also* Tex. Penal Code §§ 6.03(d), 19.05(a).[5]

---

**5.** The penal code permits a conviction for criminally negligent homicide for causing the

The circumstances are viewed from the standpoint of the actor at the time that the allegedly negligent act occurred. *Montgomery*, 369 S.W.3d at 193. "Criminal negligence does not require proof of [a defendant's] subjective awareness of the risk of harm, but rather [the defendant's] awareness of the attendant circumstances leading to such a risk." *Id.* "The key to criminal negligence is not the actor's being aware of a substantial risk and disregarding it, but rather it is the failure of the actor to perceive the risk at all." *Id.*

■■■ This Court has acknowledged that, under the law, criminal negligence is different from ordinary civil negligence. *Id.* "Civil or 'simple' negligence 'means the failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.' " *Tello*, 180 S.W.3d at 158 (Cochran, J., concurring). Conversely, "[c]onduct that constitutes criminal negligence involves a greater risk of harm to others, without any compensating social utility, than does simple negligence." *Montgomery*, 369 S.W.3d at 193. "The carelessness required for criminal negligence is significantly higher than that for civil negligence; the seriousness of the negligence would be known by any reasonable person sharing the community's sense of right and wrong." *Id.* The risk must be

"substantial and unjustifiable," and the failure to perceive it must be a "gross deviation" from reasonable care as judged by general societal standards by ordinary people. *Id.* "In finding a defendant criminally negligent, a jury is determining that the defendant's failure to perceive the associated risk is so great as to be worthy of a criminal punishment." *Id.* "The degree of deviation from reasonable care 'is measured solely by the degree of negligence, not any element of actual awareness.' " *Id.* (quoting *Tello*, 180 S.W.3d at 158 (Cochran, J., concurring)). "Whether a defendant's conduct involves 'an extreme degree of risk' must be determined by the conduct itself and not by the resultant harm." *Williams v. State*, 235 S.W.3d 742, 753 (Tex. Crim. App. 2007) (discussing "substantial and unjustifiable risk" in recklessness and criminal negligence). "Nor can criminal liability be predicated on every careless act merely because its carelessness results in death or injury to another." *Id.*

### B. Review of Facts in a Light Most Favorable to the Verdict

■■■ In its second ground for review, the State suggests that the court of appeals erred by disregarding or discounting evidence establishing that appellant drove at an excessive speed that prevented him from being able to maintain a safe distance and that his inattention caused the accident. *See* Tex. Transp. Code §§ 545.351, 545.062.[6] As we explain in more detail be-

---

death of an individual by criminal negligence. Tex. Penal Code § 19.05(a). The penal code defines criminal negligence by stating,

A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to per-

ceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

*Id.* § 6.03(d).

6. The Transportation Code limits the maximum driving speed, irrespective of the speed limit. Section 545.351 provides as follows:

low, viewing the evidence in a light most favorable to the jury's verdict, we agree with the court of appeals that (1) appellant did fail to maintain a proper speed and safe distance, (2) he was speeding but no evidence shows that he was grossly negligent by speeding excessively over the speed limit, and (3) he was inattentive but no evidence shows that he was grossly negligent in terms of the length of or reason for his inattention. We note here that the court of appeals's analysis of the facts agreed that appellant was negligent, but it disagreed that he was grossly negligent, and thus its focus was on whether appellant's speed was excessive and whether his inattention was extreme. We discuss our legal conclusions as to criminal negligence in the next section, while focusing on what the court of appeals said about the facts in this section.

### 1. Appellant Did Fail to Maintain a Safe Operating Speed and Proper Distance

The State argues that appellant was negligent because the SUV did not suddenly pull into its lane or slam on its brakes unexpectedly. Rather, the SUV was sitting with its brake lights on and turn signal flashing, waiting to make a turn. The court of appeals does not appear to have disagreed with this characterization of the evidence or with the State's suggestion that the facts amounted to ordinary negligence that would subject appellant to civil liability. The court of appeals's focus was on whether the facts demonstrated a greater degree of negligence that would subject appellant to criminal liability.

The evidence, viewed in a light most favorable to the verdict, establishes the acts that the State pleaded in the indictment, specifically, that appellant failed to maintain a safe operating speed and that he did not keep a proper distance. The evidence showed that appellant rear-ended Luna's SUV causing it to overturn, that Luna's SUV was stopped at the time of impact with its brake lights and turn signal illuminated, that appellant was traveling faster than the 36 to 37 miles per hour that he claimed, and that appellant did not brake until the point of impact. The evidence, therefore, shows that the State did prove the acts of negligence that it had asserted in its pleadings: Appellant failed to maintain a proper distance between his vehicle and the SUV, and he failed to control his speed.

### 2. Appellant Was Speeding But No Evidence Shows That It Was Excessive

 The court of appeals determined that there was inadequate evidence to support a rational conclusion beyond a reasonable doubt that appellant was excessively speeding, and we generally agree with that assessment. As we discuss more fully in

(a) An operator may not drive at a speed greater than is reasonable and prudent under the circumstances then existing;
(b) an operator
(1) may not drive a vehicle at a speed greater than is reasonable and prudent under the conditions and having regard for actual and potential hazards then existing; and
(2) shall control the speed of the vehicle as necessary to avoid colliding with another person or vehicle that is on or entering the highway in compliance with the law and the duty of each person to use due care.

Tex. Transp. Code § 545.351. The Transportation Code also prohibits a driver's failure to maintain a safe operating distance between vehicles. Section 545.062 provides that "[a]n operator shall, if following another vehicle, maintain an assured clear distance between the two vehicles so that, considering the speed of the vehicles, traffic, and the conditions of the highway, the operator can safely stop without colliding with the preceding vehicle or veering into another vehicle, object, or person on or near the highway." *Id.* § 545.062(a).

the next section discussing the legal implications of the facts shown in the record, the focus on whether appellant drove excessively over the speed limit was pertinent to whether appellant was criminally negligent rather than ordinarily negligent.

The court of appeals found that, "[a]lthough a conclusion that [appellant] was excessively speeding 'may not be completely unreasonable,' 'it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt.'" *Queeman*, 486 S.W.3d at 77 (quoting *Hooper*, 214 S.W.3d at 16). The State argues that the court of appeals erred by deciding that the jury could not have rationally determined that appellant was excessively speeding, and it argues in its brief that "appellant was traveling at a speed well above the legal limit and high enough to be lethal when the collision occurred." We disagree with the State because the evidence of appellant's speed, even when viewed in a light most favorable to the jury's verdict, would not permit a rational jury to determine that he was excessively speeding. Although it is true that Welch used the word "significantly" when he said that he believed appellant was driving "significantly" faster than the approximately 36 to 37 miles per hour claimed by appellant, it would be irrational under the record in this case for the jury to determine that this testimony meant that appellant drove excessively over the speed limit. Welch did not attempt to quantify his belief and did not explain what he meant by the word "significantly" in this context. Welch did not explain whether he meant that appellant was driving, for example, five miles faster than 37 miles per hour, which would make him only two miles faster than the speed limit of 40 miles per hour, or, alternatively, some greater speed such as ten miles per hour or more over the speed limit. Welch further testified that he was unable to ascertain appellant's

specific pre-impact speed based on the facts that were available to him. Furthermore, Welch did not cite appellant for speeding. Although the jury was presented with evidence that the collision caused Luna's SUV to overturn, no evidence was offered as to whether a collision at or below the speed limit could have caused the SUV to overturn. Additionally, while photo exhibits were published to the jury showing Luna's totaled SUV, no evidence or testimony was presented to resolve what damage to Luna's SUV resulted from appellant's vehicle, the oncoming truck onto which the SUV rolled, or the ground during the rollover. Nor was testimony or evidence offered to explain what amount of damage would be consistent with an impact at a given speed. Thus, examining Welch's testimony in a light most favorable to the jury's verdict, a rational juror could conclude that appellant was driving over the posted speed limit. A rational juror, however, could not conclude that appellant was excessively speeding because that would require speculation beyond what is shown by the evidence or what could be rationally inferred from the evidence in the record. *See Hooper*, 214 S.W.3d at 15-16; *cf. Thompson v. State*, 676 S.W.2d 173, 176-77 (Tex. App.—Houston [14th Dist.] 1984, no pet.) (finding evidence legally sufficient to support criminally negligent homicide for speeding and failure to keep a proper lookout when evidence demonstrated that defendant was driving twenty miles per hour above speed limit); *Cooks v. State*, 5 S.W.3d 292, 295-96 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (affirming manslaughter conviction with speeding forty-five miles per hour over limit).

### 3. Appellant Was Inattentive But No Evidence of Reason for or Length of Inattention

 The State argues that the court of appeals erred by considering appellant's

van's collision with the back corner of the SUV as evidence of his efforts to avoid the accident rather than as evidence of his inattentiveness. We agree with the State that, viewed in a light most favorable to the jury's verdict, it would be improper to view that evidence as establishing that appellant made an effort to avoid the accident because the record is silent as to the reason why appellant struck the back corner rather than the back middle of the SUV. We, therefore, disagree with the determination by the court of appeals that the evidence "establish[ed] that [appellant] observed Luna's vehicle in time to swerve and hit the right passenger end of her vehicle." *Queeman*, 486 S.W.3d at 77.

The evidence at trial established that the collision occurred at an angle between the front left of appellant's vehicle and the rear right of Luna's SUV. A reasonable juror could have one of two alternative equally reasonable views of this evidence. On the one hand, a reasonable juror could believe appellant's claim that this offset angle was a result of his trying to swerve to avoid the collision. On the other hand, a reasonable juror could believe that appellant's inattentiveness caused him to strike the corner of the SUV for some unknown reason other than his efforts at corrective action. The record shows only that appellant struck the back corner of the SUV and not the reasons why he struck it there rather than in some other place. Because we must view the evidence in a light most favorable to the verdict, we proceed on the assumption that the jury did not believe that appellant swerved to avoid the accident and that the collision was a result of his inattention.

Although we agree with the State that the jury rationally could have determined that appellant did not swerve to avoid striking the SUV, we note here that there is no evidence in the record about the length of time that appellant was inattentive before colliding with the SUV or the reasons for his inattentiveness. Although the State suggests that "appellant was speeding without even looking up to see if there was anyone or anything to avoid on a highway going thru a town and lined with businesses," that statement is speculative because there is nothing in the record to show where appellant was looking, the reason for his inattentiveness, or the length of time that he was inattentive. Thus, although the record supports a rational conclusion that appellant was inattentive long enough for him to collide with the back corner of Luna's SUV, nothing in the record demonstrates whether this was ordinary or gross inattentiveness that contributed to the collision.

Having examined the record in a light most favorable to the jury's verdict, we next turn to the State's contention that a jury rationally could have determined that the evidence in this case proved criminally negligent homicide.

### C. Facts In the Record Do Not Establish Criminal Negligence

The State's first ground suggests that appellant's conduct—his inattention to traffic that caused him to fail to maintain a proper distance and his failure to maintain a safe speed—is worthy of a criminal sanction because "the excessive speed and prolonged inattention required to hit a stationary vehicle in one's lane under good driving conditions involves a greater risk of harm than a simple fender bender without any compensating social utility." Further, the State asserts that "it is common knowledge that failing to maintain a safe speed and keep a proper distance poses a great risk to other drivers on the road and that anyone sharing the community's sense of right and wrong would be aware of the seriousness of doing so." The State notes that "[c]riminal negligence hinges not on

motive or even knowledge of the risk but on knowledge of the circumstances" creating the risk. The State argues that appellant knew that he was speeding and that he was not watching the road for an extended period of time, and that as a result, appellant collided with a stationary vehicle and killed one of its occupants. The State suggests that this "failure to perceive the substantial and unjustifiable risk presented by such conduct was, by definition, a gross deviation from the standard of care that an ordinary person would exercise under the circumstances," and, accordingly, the jury decided, as "ordinary persons," that appellant was guilty of negligent homicide. The State asserts that, because the precise meanings of "gross deviation" and "substantial and unjustifiable risk" are necessarily vague, criminal negligence is an ad hoc, fact-intensive determination that must be left to juries, as society's representatives, to decide whether conduct deserves criminal liability. The State contends that the court of appeals erred in its sufficiency review because it would require "conduct akin to 'dangerous speeding, racing, [or] failure to obey traffic signals,' or some 'other type of serious blameworthy conduct like distracted driving due to cell phone use and an abrupt, aggressive, unsafe lane change as in *Montgomery* [*v. State*, 369 S.W.3d 188 (Tex. Crim. App. 2012)] or drug or alcohol intoxication,'" but that this Court's precedent suggests that these additional circumstances (*i.e.*, underlying criminal conduct like driving while intoxicated, multiple failures to exercise due care, or egregious/shocking risk taking) are not required for criminal negligence. The State also contends that the court of appeals erred by seemingly requiring an explanation for why the conduct resulting in fatality occurred to support a guilty verdict. The State argues that the lower court's reliance on *Tello*'s adoption of *Boutin*'s "unexplained failures" lan-

guage incorrectly shifted the central focus in criminal negligence—the awareness of the circumstances creating the risk—onto why the conduct occurred, which improperly burdened the State. *See Queeman*, 486 S.W.3d at 73-74 (citing *Tello*, 180 S.W.3d at 157-58; *Boutin*, 556 N.Y.S.2d 1, 555 N.E.2d at 254).

We compare the facts of appellant's case to two recent cases in which this Court has reviewed the sufficiency of the evidence for criminal negligence.

### 1. *Montgomery*

In *Montgomery v. State*, this Court upheld a conviction for criminally negligent homicide. 369 S.W.3d at 191. The facts in that case showed that Montgomery drove in the center lane of a three-lane service road adjacent to the interstate while talking on her cell phone. *Id.* After hanging up the phone, Montgomery realized that she had missed the entrance ramp to the interstate that diverged from the left lane, and she abruptly swerved into the left lane in an attempt to exit the service road onto the interstate. *Id.* This lane change occurred some distance after passing the "safety barrier"—the beginning of the solid-white-lined area on the pavement between the ramp and the service road. *Id.* As a result of the abrupt, late lane change, a three-vehicle accident ensued in which a passenger in one of the vehicles was killed. *Id.* Montgomery was convicted of criminally negligent homicide based on the State's evidence of her use of a cell phone, her unsafe lane change, and her failure to maintain a proper lookout. *Id.* In upholding Montgomery's conviction, we observed that she was driving slower than surrounding traffic, was past the "safety barrier" when she abruptly changed lanes, did not signal her lane change or look for surrounding traffic, and attempted to enter an on-ramp past its entrance. *Id.* at 194. We

held that a jury could have reasonably concluded that, under these circumstances, Montgomery was criminally negligent in that she "ought to have been aware of the substantial and unjustifiable risk created by her actions." *Id.* We noted that it was "common knowledge that failing to maintain a proper lookout and making an unsafe lane change without signaling or checking for upcoming traffic poses a great risk to other drivers on that road and that anyone sharing the general community's sense of right and wrong would be aware of the seriousness of doing so." *Id.* Further, we held that a jury could have reasonably found that Montgomery's failure to appreciate that substantial and unjustifiable risk, given the circumstances known to her at the time, was a gross deviation from a standard of care that an ordinary person would exercise under the same circumstances. *Id.* We observed, "The [S]tate presented evidence that [Montgomery] had missed the entrance ramp for the highway because she was distracted by talking on her cell phone. Further evidence indicated that, although [Montgomery] knew that she had missed the entrance ramp, she still attempted to move to the left lane, cut across the 'safety barrier,' and get onto the entrance ramp." *Id.* at 194-95.

In contrast to *Montgomery*, here the accident did not include circumstances suggesting that appellant was engaging in any activity while driving that a reasonable person would know might distract him. Further, the evidence does not show that appellant made any particular driving maneuver, such as a late lane change without signaling, that a reasonable driver would recognize as being inherently unsafe. There was no evidence presented that appellant was tailgating unreasonably close to Luna's SUV or was driving aggressively, for example. At most, the evidence shows that appellant was inattentive for an unknown period of time while he was driving at a speed that was unsafe based on his distance from the SUV and that he did not see the SUV in time to avoid striking its rear-right side. This is the type of ordinary negligence that stems from misjudging speed and distance that may result in civil liability for traffic collisions. We conclude that this case is distinguishable from *Montgomery* because, as compared to that case, here there is no evidence that appellant was excessively speeding or undertaking some unreasonable activity that caused his inattention and failure to gauge his distance, and his failures that are shown in this record cannot be characterized as a "gross deviation" from the ordinary standard of care. *Id.*

## 2. *Tello*

The State compares appellant's conduct to those facts found supporting criminal liability in *Tello v. State*, 180 S.W.3d 150 (Tex. Crim. App. 2005). We therefore also compare the facts of this case to our decision in *Tello*. Tello was convicted of criminally negligent homicide for "failing to properly secure a trailer to his truck" after the homemade trailer he used to tow a load of dirt unhitched in transit from his truck and killed a pedestrian. *Id.* at 150. On discretionary review, we found that the evidence presented in that case was sufficient to uphold Tello's conviction. *Id.* at 158. The evidence at trial showed that Tello did not connect the trailer with safety chains as required by state law, the ball-hitch attachment was not properly attached, and the hitch did not lock properly due to having been hammered or hit repeatedly in attempt to get it to latch. *Id.* at 151-53. We reasoned that the cumulative effect of these circumstances presented a dangerous situation because an ordinary person would know that the trailer could detach in transit. *Id.* at 156. Moreover, the

evidence supported a finding that these faults were obvious and known to Tello, and thus, he was "on notice of problems he should have been able to perceive." *Id.* at 157. We rejected Tello's claim that any negligence on his part failed to rise to the level of criminal negligence. We explained that a rational jury could have found that Tello should have, but failed, to perceive a substantial and unjustifiable risk of death from his conduct of knowingly using a faulty trailer hitch without safety chains on a public road. *Id.* at 156. We further concluded that the jury could have rationally found that appellant's failure to perceive this substantial and unjustifiable risk of death was clearly a gross deviation from the standard of care that an ordinary person would exercise under the circumstances. *Id.*

To illustrate when evidence could be insufficient to support a criminally negligent homicide verdict, we cited *People v. Boutin*, 556 N.Y.S.2d 1, 555 N.E.2d at 254. We quoted language from that case, in which the New York Court of Appeals explained,

> Our decisions construing these provisions have emphasized that criminal liability cannot be predicated on every act of carelessness resulting in death, that the carelessness required for criminal negligence is appreciably more serious than that for ordinary civil negligence, and that the carelessness must be such that its seriousness would be apparent to anyone who shares the community's general sense of right and wrong [citations omitted]. What, we believe, is abundantly clear from our decisions and from the governing statutory language is that criminally negligent homicide requires not only a failure to perceive a risk of death, but also some serious blameworthiness in the conduct that caused it. The risk involved must have been "substantial and unjustifiable," and the failure to perceive that risk must

have been a "gross deviation" from reasonable care.

*Tello*, 180 S.W.3d at 157–58 (quoting *Boutin*, 556 N.Y.S.2d 1, 555 N.E.2d at 254). Applying these principles in *Boutin*, the New York Court of Appeals held that the evidence did not show that the defendant "engaged in any criminally culpable risk-creating conduct—e.g., dangerous speeding, racing, failure to obey traffic signals, or any other misconduct that created or contributed to a 'substantial and unjustifiable' risk of death." *Boutin*, 556 N.Y.S.2d 1, 555 N.E.2d at 256. Rather, in that case, the court determined that evidence that the defendant ran into a parked car established "only that [the] defendant inexplicably failed to see the vehicle until he was so close that he could not prevent the collision. Though it resulted in two tragic deaths, that unexplained failure, without more, does not constitute criminally negligent homicide." *Id.* In distinguishing those circumstances from the facts at issue in *Tello*, we observed that the dangers attending the faulty trailer hitch were obvious and that the evidence established that an ordinary person would not have disregarded such a risk. *Tello*, 180 S.W.3d at 158. Thus, in *Tello* we said, "This case involves much more than an unexplained failure of a trailer hitch that caused a death. This case also involves 'some serious blameworthiness in the conduct that caused it.'" *Id.* (quoting *Boutin*, 556 N.Y.S.2d 1, 555 N.E.2d at 254).

We compare the instant case to this Court's decision in *Tello*, in which the circumstances showed that an ordinary person would realize that, without safety chains and with an improperly functioning trailer hitch, the trailer could detach while being towed. In this case, the evidence did not show that appellant was "on notice" of any particular circumstance that an ordinary person would perceive as creating a

substantial and unjustifiable risk and for which it would be a gross deviation from the ordinary standard of care to ignore that risk. The evidence here established that a fatal accident occurred due to appellant's failure to stop his vehicle sooner, but not that appellant's failure to perceive the risk of such an accident occurring under the circumstances constituted a gross deviation from an ordinary standard of care. As in *Boutin*, therefore, the evidence here is sufficient to show carelessness, but it does not establish that appellant engaged in any criminally culpable risk-creating conduct or that his conduct was such that it posed a substantial and unjustifiable risk of death, or that the failure to perceive that risk was a gross deviation from reasonable care under the circumstances.

■■■■ Driving is a common activity that has risks about which a reasonable person would be cognizant. Failure to appreciate those risks and the circumstances that create them can support ordinary negligence. Criminal negligence, however, requires a greater showing—that the risk is "substantial and unjustifiable" and that the failure to perceive the circumstances creating the risk is a "gross deviation" from the usual standard of care. The dispute here concerns the latter portion of the inquiry with respect to whether appellant's conduct grossly deviated from the ordinary standard of care due to his failure to perceive that these circumstances created a risk of a fatal accident. As the court of appeals essentially determined, the facts in this case satisfy the ordinary civil standard of negligence based on appellant's failure to control his speed and following the SUV without maintaining a safe distance between the vehicles. These types of driving errors are often made by many drivers who also accept these same risks from other drivers because of the great social utility afforded by automotive transportation. Absent more egregious conduct, however, these errors alone fail to show a gross deviation from the usual standard of care in driving. Here, this record shows that appellant failed to control his speed and did not maintain a safe distance, but, as discussed above, the evidence fails to show that he grossly deviated from the standard of care, for example, by excessively speeding. Additionally, the record does not show how long the SUV had been stopped to make its turn, and thus, there is nothing in the evidence to indicate the length of time for which appellant was inattentive. For this reason, it would be speculative to determine that appellant's failure to observe the SUV earlier was the result of inattention that was a gross deviation as compared to the usual standard of care of an ordinary driver scanning for traffic ahead. Furthermore, although the State need not prove the reasons why a driver was inattentive in order to establish criminal negligence, we note here that there is nothing in this record to show that appellant was engaged in acts that might be characterized as grossly negligent in the context of his failure to control speed and failure to maintain a safe distance, such as talking on a cell phone, texting, or intoxication. Tragic consequences, as here, do not elevate ordinary negligence to criminal negligence. *See Williams*, 235 S.W.3d at 753. We conclude that appellant's failure to maintain a safe speed and proper distance are acts showing a deviation from the ordinary standard of care expected of drivers on our roads, but, without more, they do not rise to the level of a gross deviation from that standard of care and thus do not constitute criminally negligent homicide.

The State suggests, however, that this Court should defer to the jury's determination that appellant was criminally negligent because the jury's decision represents society's views of ordinary versus gross

negligence. But if we were to always defer to a jury's determination that a defendant's acts established gross deviations from the ordinary standard of care rather than simple negligence under that jury's subjective point of view, then we would be abdicating our responsibility to conduct reviews for the legal sufficiency of the evidence to ensure that the evidence establishes the elements of an offense. We agree with the State, however, that as long as there is some evidence of a gross deviation from the ordinary standard of care, when viewed in a light most favorable to the jury's verdict, this Court should defer to a jury's determination of criminal negligence. We decline to defer to the jury's determination here due to the absence of any evidence of a gross deviation from the ordinary standard of care. In this case, there is no evidence that appellant engaged in any more extreme, aggressive, or foolish driving acts than are ordinarily engaged in by drivers and accepted as reasonable risks in exchange for the social utility provided.

We hold that there is no evidence of a failure to perceive a substantial and unjustifiable risk that constituted a gross deviation from the standard of care that an ordinary person would have exercised under the circumstances, and, thus, the evidence is legally insufficient to establish criminal negligence.

### III. Conclusion

The evidence presented at trial, viewed in the light most favorable to the verdict, does not demonstrate that appellant's conduct—his failure to keep a proper lookout and maintain control of his vehicle's speed—rose to the level of criminal negligence. Agreeing with the court of appeals that the evidence is legally insufficient to establish criminally negligent homicide, we affirm the judgment of the court of appeals.