

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-17-00374-CR

_____

CHAD HAYNES, Appellant

V.

THE STATE OF TEXAS

_____

On Appeal from the 431st District Court
Denton County, Texas
Trial Court No. F16-2748-431

_____

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Memorandum Opinion by Justice Kerr

# MEMORANDUM OPINION

A jury convicted Chad Haynes of family-violence assault with a previous conviction and sentenced him to three years in the penitentiary. *See* Tex. Penal Code Ann. § 22.01(b)(2)(A). In one issue, Haynes contends that the evidence is insufficient to prove that he committed the offense. Specifically, he argues that the complainant's story was not corroborated; nothing showed that he was at the complainant's apartment, as the complainant asserted; the complainant waited about twelve hours before going to the police; and the police department "conducted no real investigation." We affirm.

## Evidence

*The complainant described her relationship with Haynes, the assault, and her trip to the police station to make a report.*

Testifying at the October 2017 trial, Ruby Johnston said that she and Haynes had started dating in late 2014, dated for about 18 months, and—at the time of the assault—had a child together. Although they "never really officially broke up," their relationship "was just, kind of, in the air a lot of times," and they continued to see each other romantically but sporadically. In the spring of 2016, Haynes came over on a weekly basis to help her with their child.

Late on the evening of May 25, 2016, around midnight, Haynes went to Johnston's apartment in Lewisville, looked through messages on her phone, and "didn't like what he saw"—Johnston had been sending messages to another man. At

that time, Johnston stated that she and Haynes were "kind of" together. "It was always up in the air," she added, "so I just kind of assumed."

Angry about the messages, Haynes hit Johnston's face multiple times with his hand; she testified that it hurt and caused her ears to ring. Haynes then threw her phone and her 11-year-old son's phone on the ground, breaking both.[1] When red marks began to appear on Johnston's face, Haynes had her press frozen vegetables to her face for a couple of hours. Although Johnston asked Haynes to leave, he stayed until 8:00 a.m., when she left to take her other children to school.

After dropping her children off at school, Johnston then went to her mother's house, where they discussed what had happened. Johnston wanted to make a police report, but she was afraid to do so because she had an outstanding ticket in Grapevine. So she first paid that ticket and then, around 11:00 a.m., went to the Lewisville Police Department and told an officer what had happened. That officer photographed her and the broken phones.

Johnston acknowledged later telling the police that she did not want to prosecute Haynes. After this incident, in fact, she and Haynes had another child together. Even on the stand, she asserted that she did not want to testify against Haynes "because [she had] two kids with him."

---

[1]Johnston had two children from a previous relationship when she and Haynes began dating.

*Officer George Nichols recalled Johnston's making a written statement and how her injuries and the damage to two phones were consistent with her account of what had happened.*

Officer George Nichols remembered Johnston's coming into the police department regarding an assault on May 26, 2016. The two talked, and she gave a written statement. He observed red marks on her face that were consistent with her description of what had happened. Reviewing the photographs he had taken that day, Officer Nichols said at trial that he believed Haynes had assaulted Johnston with his hand because the bruising was shaped like a handprint.

Johnston also showed Officer Nichols the two broken phones. He elaborated: "Ms. Johnston told me that Mr. Haynes had broken them after reading some texts in one of them and looking through the phone." One, he said, appeared to have been thrown on the ground several times, and the other one looked like it had been bent and broken apart. He did not think either phone was operable.

During Officer Nichols's 18 years as a police officer, he had frequently seen victims become reluctant to cooperate, explaining that "afterwards they feel that there [are] going to be repercussions for . . . wanting help."

After Officer Nichols took Johnston's report, he had no further dealings with the case: "I'll do the report, I'll take the photographs, I'll . . . upload them into evidence, and the case is forwarded to a detective." He did not check Johnston's background or talk to any other witnesses.

*Detective Scott Austin investigated, but Johnston did not want the case prosecuted, and Haynes avoided him.*

Detective Scott Austin was assigned to the domestic-violence unit, where his primary job was to investigate family-violence cases. He explained that sometimes victims ask that charges be dropped for various reasons: they might fear retaliation, there might be financial considerations, there might be children, and "things like that." "A lot of times," he added, "victims will want to drop the charges due to pressure from the suspect." Regardless of the victim's wishes, Detective Austin would continue to investigate the case. He also explained that most family-violence cases occurred in the home, so normally there were no surveillance videos or other witnesses.

In Johnston's case, although she made her report on May 26 and although Detective Austin was assigned her case the next day, he did not try to contact her until about three or four weeks later. After two unsuccessful attempts, he talked to her on June 24, but "she told me [that] she did not want to pursue the case." Johnston did not deny that the incident had occurred, but she would not give him an account of what had happened. Detective Austin stated that the reasons Johnston gave for not wanting to pursue the charges were consistent with reasons other victims had given

him before. Despite Detective Austin's telling Johnston that he was not going to drop the charges, Johnston did not change her story or deny that the assault had occurred.[2]

Next, Detective Austin asked Johnston to talk to Haynes about contacting the police and about turning himself in, but Johnston reported back that Haynes had no desire to speak with him. Detective Austin procured an arrest warrant for Haynes on June 29 and tried, without success, to contact Haynes on June 30 and July 1. Haynes was ultimately arrested on July 3.

On cross-examination, Detective Austin admitted that he did not go to Johnston's neighbors to determine if they had heard anything strange and did not set up surveillance on the complex. Nor did he ask anyone about Johnston's reputation for truthfulness, look into her background, or check her mental-health history.

But based on his entire review, he nevertheless thought that the domestic-violence offense had occurred. For one thing, the photographs corroborated Johnston's story: Detective Austin noticed that "the side of her face was red[,] and [the redness] appeared to have the outline of a hand and fingers."

---

[2]Detective Austin dropped the criminal-mischief charge against Haynes at Johnston's request. Detective Austin estimated the value of the two broken iPhones to be about $1,400. The difference between the two offenses, he explained, was that one was a property crime and the other was a "persons crime." "When she asked me to drop [the] criminal mischief charges, I have to," he explained, but "[i]n a domestic violence case, I don't have to drop the charges."

## Standard of Review

Federal due process requires that the State prove beyond a reasonable doubt every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979); *see* U.S. Const. amend. XIV. In our due-process evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. Thus, when performing an evidentiary-sufficiency review, we may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved

any conflicting inferences in favor of the verdict and defer to that resolution. *Murray*, 457 S.W.3d at 448–49.

## Discussion

At its core, Haynes's complaint is not that the State failed to prove each element of the offense but that the jury chose to believe Johnston's testimony. But as the sole judge of the evidence's weight and credibility, the jury was free to believe Johnston, who never recanted despite her later unwillingness to press charges. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622; *Murray*, 457 S.W.3d at 448–49. The jury was also free to discount any perceived lack of corroborating witnesses, the absence of any other witness placing Haynes at her apartment, and any shortcomings in Officer Nichols's or Detective Austin's investigations. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622; *Murray*, 457 S.W.3d at 448–49. And viewing the evidence in the verdict's most favorable light, the jury presumably reconciled Johnston's failure to contact the police sooner with the facts that Haynes had broken both her and her son's phones, that Haynes remained at her apartment for eight hours after the assault, and that Johnston wanted to pay her outstanding ticket in Grapevine before reporting the assault in Lewisville to avoid being arrested herself. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622; *Murray*, 457 S.W.3d at 448–49.

A single witness's testimony can support a conviction. *See Hernandez v. State*, No. 04-17-00340-CR, 2018 WL 1176371, at *1 (Tex. App.—San Antonio Mar. 7,

8

2018, no pet.) (mem. op., not designated for publication); *Shah v. State*, 403 S.W.3d 29, 35 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd); *Davis v. State*, 177 S.W.3d 355, 359 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (citing *Aguilar v. State*, 468 S.W.2d 75, 77 (Tex. Crim. App. 1971)); *see also Lee v. State*, 239 S.W.3d 873, 878 (Tex. App.— Waco 2007, pet. ref'd) ("As the sole judge of the weight and credibility of witness testimony, the jury was entitled to disregard [the defendant's] testimony and accept [the complainant's]."). Here, we hold that Johnston's testimony sufficiently supports the conviction.

## Conclusion

We overrule Haynes's issue and affirm the trial court's judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: April 4, 2019