

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-23-00282-CR

———————————————————

ROBERT ELLIOT HOPKINS, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 213th District Court
Tarrant County, Texas
Trial Court No. 1722063

Before Sudderth, C.J.; Womack and Walker, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

Appellant Robert Elliot Hopkins challenges his conviction for aggravated assault of Carol Boyd with a deadly weapon. *See* Tex. Penal Code Ann. § 22.02(a)(2). He argues that, because he testified that he had not threatened Boyd, the evidence was insufficient to support his conviction, and the trial court should have granted his motion for a directed verdict. But Boyd testified that Hopkins had, in fact, threatened to kill her with a knife, and the jury's verdict reflects that it chose to believe Boyd's testimony over Hopkins's. Because it was the sole province of the jury to decide which witness to believe, and because Boyd's testimony—particularly when taken together with other corroborating evidence—was sufficient to support the verdict, we will affirm.

## I. Background

The only two witnesses to the aggravated assault—Boyd and Hopkins—had radically different recollections of the event.

## A. Boyd's Version

Boyd testified that she had been close friends with Hopkins's mother, and that when Hopkins's mother had needed assistance with Hopkins, Boyd had offered to help. Boyd brought Hopkins his social security income each Saturday, she helped him

with groceries and similar chores, and she assumed an informal role as landlord on behalf of Hopkins's mother, who owned the home where Hopkins lived.[1]

A week before the incident, Boyd had discovered that someone was living with Hopkins. According to Boyd, when she reminded Hopkins of the house rule that he could not have roommates, Hopkins "got really upset about it." A few days later, he dialed Boyd's phone number repeatedly[2] and "called [her] a f***ing b****," saying that "[n]obody tells [him] what to do."

The following Saturday, when Boyd returned to Hopkins's home as usual, she opened the door to find the house in disarray with sheetrock on the floor and holes in the walls. She asked Hopkins what had happened and told him that "this [wa]s not okay." In response, Hopkins "started cussing at [her]," he "pulled a knife," he raised it above his head, and he "started towards [her]" while saying that "nobody tells him what to do" and threatening that he was "going to kill [her] . . . f****** b****." Boyd used her keychain of mace to spray Hopkins and fled out the front door, but Hopkins followed her onto the porch. Because Hopkins was positioned between Boyd and the stairs to the front gate, she sprayed him with the mace again so that she could run

---

[1]Although Hopkins's mother provided a house for him to live in, according to Boyd, she had asked Boyd to "to tell [Hopkins] that [Boyd] own[ed] it, or [Hopkins would] destroy it." At trial, Hopkins confirmed that he had been told that Boyd owned the house.

[2]Boyd explained that Hopkins had borrowed another person's phone to call her because he had destroyed his own phone in anger. At trial, Hopkins confirmed that he had "thr[own] [his phone] against the wall and broke[n] it" out of anger.

down the front steps and out to her vehicle. Boyd later recalled how, as she ran, Hopkins had continued "yelling at [her]," "calling [her] names" and saying "he[ wa]s going to kill [her]" while holding up his knife. She told the jury that she had indeed believed that Hopkins was going to kill her that day. At trial, Boyd told the jury that she no longer helped with Hopkins.

**B.    Hopkins's Version**

Hopkins remembered things differently. He testified that he had not been angry or upset when Boyd told him that he could not have a roommate and that he had responded to Boyd "in an appeasing manner and timidly." He claimed that Boyd "kept yelling at [him] for over a week after [the roommate] had been moved out," so even though he had not been upset initially, he had "brooded on it afterwards" and "kicked holes in the wall" out of anger.

As for the day of the incident, Hopkins recalled that, when Boyd came by the house, she saw the holes in the walls and told him to "get out," prompting an argument about whether she was required to take legal steps to evict him. Hopkins denied threatening Boyd, denied holding his knife over his head, and denied chasing her out of the house. To the contrary, he claimed that, as they were arguing, Boyd "started moving towards [him] in an aggressive manner" with "a threatening look and body posture," so he "took the knife out of [his] pocket[,] . . . took a step backwards[,] and . . . said ['g]et away from me.'" He explained that he had pulled the knife because he "thought [Boyd] was going to smack [him] around and humiliate [him]," though he

4

conceded on cross-examination that she had never smacked him around or humiliated him in the past. Regardless, according to Hopkins, Boyd had responded by spraying him "gratuitously" with mace while continuing to argue with him about eviction.

## C.    Trial and Verdict

A jury heard these conflicting recollections from Boyd and Hopkins, and it also heard testimony from two police officers who had responded to Boyd's call on the day of the incident.[3] The officers testified that Boyd had been "frantic, fearful, crying, [and] visibly shaken" when they arrived and that, when Boyd saw Hopkins in the street and pointed him out, Hopkins jumped a fence into his backyard to get away.[4] According to the officers, Hopkins had a knife in his pocket when he was detained, and he "made some statements that he wanted to [or] . . . that he was going to kill [Boyd]," such as, "I'm going to get her good, she's dead meat." This specific statement was captured on one of the officer's body-camera videos, and it was replayed for the jury.[5]

---

[3]Boyd testified that, after leaving Hopkins's house, she called Hopkins's mother and then the police.

[4]When Hopkins was asked why he had jumped the fence when the police approached him, he stated that he "was expecting them to see . . . things her way and take [him] to jail."

[5]The videos also captured Boyd's frightened demeanor, showed her telling the officers what had happened, and recorded Hopkins jumping the fence and the officers detaining him.

Although Boyd moved for a directed verdict after the State rested its case, the trial court denied the motion. The jury then convicted Hopkins of committing aggravated assault by intentionally or knowingly threatening imminent bodily injury to Boyd while using or exhibiting a deadly weapon. *See id.* §§ 22.01(a)(2), .02(a)(2). After the trial court heard punishment evidence, it sentenced Hopkins to four years' confinement.

Hopkins appeals, challenging the trial court's failure to grant a directed verdict.

## II. Standard of Review

"[A] motion for directed verdict is essentially an evidentiary-sufficiency challenge," so appellate review of such a motion is akin to a review of the sufficiency of the evidence. *Blankenship v. State*, No. 02-19-00069-CR, 2023 WL 8267709, at *2 (Tex. App.—Fort Worth Nov. 30, 2023, no pet.) (mem. op. on remand, not designated for publication); *Jennings v. State*, Nos. 02-21-00161-CR, 02-21-00162-CR, 2023 WL 2179466, at *1 (Tex. App.—Fort Worth Feb. 23, 2023, no pet.) (mem. op., not designated for publication); *see Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996).

When reviewing the sufficiency of the evidence, we view all the evidence in the light most favorable to the verdict to determine whether any rational jury could have found the crime's essential elements beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim.

6

App. 2017).  The jury alone resolves conflicts in the evidence and determines the weight to assign to that evidence.  *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Metcalf*, 597 S.W.3d at 855; *Queeman*, 520 S.W.3d at 622.  "This means that the jury can believe all, some, or none of a witness's testimony." *Metcalf*, 597 S.W.3d at 855.  We may not usurp the jury's role by re-evaluating the evidence and substituting its judgment with our own.  *Queeman*, 520 S.W.3d at 622; *see Zimmerer v. State*, Nos. 02-22-00180-CR, 02-22-00181-CR, 02-22-00182-CR, 02-22-00183-CR, 02-22-00184-CR, 2023 WL 6152466, at *6–7 (Tex. App.—Fort Worth Sept. 21, 2023, pet. ref'd) (mem. op., not designated for publication).

### III.  Sufficiency of the Evidence

Hopkins contends that the trial court should have granted his motion for directed verdict because the evidence was insufficient to prove that he threatened Boyd with a knife, much less that he did so with the requisite intent.[6]  *See* Tex. Penal Code Ann. §§ 22.01(a)(2), .02(a)(2).  Although he acknowledges that "there was disputed evidence," he points to his version of events and—implicitly challenging the

---

[6]In Hopkins's statement of the issue presented, he frames the question as a challenge to the evidence of his mens rea, claiming that there was "insufficient evidence to establish that [he] acted intentionally or knowingly."  [Capitalization altered.]  But the substance of his brief addresses the jury's general failure to believe his testimony that he did not threaten Boyd at all.  In an effort to reach the merits of Hopkins's argument, we liberally construe his brief as raising the broader sufficiency issue.  *See* Tex. R. App. P. 38.9.

7

jury's failure to believe him—contends that "[i]t can logically follow" from his testimony that he did not intentionally or knowingly threaten Boyd.

But what "can logically follow" from a wholesale adoption of Hopkins's testimony is not the question. The jury was presented with conflicting testimony—as Hopkins acknowledges—and "as with so many . . . cases, the verdict turn[ed] on which evidence the jury chose to believe." *Ofurum v. State*, No. 02-17-00134-CR, 2018 WL 1865877, at *5 (Tex. App.—Fort Worth Apr. 19, 2018, no pet.) (mem. op., not designated for publication) (holding evidence sufficient when defendant denied interfering with emergency call but "the jury was entitled to believe all, some, or none of his testimony"); *see Blankenship*, 2023 WL 8267709, at *3 (stating that, "[a]lthough [the defendant] disputed [the complainant's] testimony, the factfinder judged the credibility of the evidence and was not obliged to believe him"). The verdict reflects that the jury chose to believe Boyd's testimony over Hopkins's, and we cannot second-guess that credibility decision on appeal. *See Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000) (stating that, in sufficiency review, the appellate court "resolve[s] inconsistencies in the testimony in favor of the verdict"); *Zimmerer*, 2023 WL 6152466, at *7 (recognizing that "we cannot act as the 'thirteenth juror'" or "re-evaluate the evidence's weight and credibility"); *Rickard v. State*, No. 02-18-00350-CR, 2019 WL 4866037, at *5 (Tex. App.—Fort Worth Oct. 3, 2019, pet. ref'd) (mem. op., not designated for publication) (noting that, "[b]y its verdict, the jury has shown that it chose to believe [the complainant's] testimony").

The real question, then, is whether a rational jury, having resolved the testimonial conflicts against Hopkins, had more than a modicum of evidence to find beyond a reasonable doubt that he intentionally or knowingly threatened Boyd with imminent bodily injury while using or exhibiting a deadly weapon. *See* Tex. Penal Code Ann. §§ 22.01(a)(2) (defining assault by threat), .02(a)(2) (defining aggravated assault); *see also Queeman*, 520 S.W.3d at 622 (reciting standard of review that evidence is insufficient if there is no or merely a modicum of evidence of an essential element, or if the evidence conclusively establishes a reasonable doubt). The answer is yes.

Boyd testified that Hopkins threatened to kill her while holding a knife over his head, that he followed her outside and continued issuing this threat when she attempted to flee the house, and that she thought he was going to kill her. *See Schmidt v. State*, 232 S.W.3d 66, 68–69 (Tex. Crim. App. 2007) (declining to decide whether assault by threat required evidence that victim perceived threat but noting victim's perception of threat as evidence supporting jury's finding that threat was made). Her testimony was corroborated not only by the responding officers' testimony but also by their body-camera footage. The footage showed Boyd's frightened demeanor on the day of the incident, her description of events in a manner substantially similar to her testimony, and Hopkins's video-recorded statement that he would "get her good, she's dead meat." This constituted far more than a modicum of evidence to support the jury's conclusion that Hopkins intentionally or knowingly threatened imminent bodily injury to Boyd while using or exhibiting a knife. *See Jennings*, 2023 WL 2179466,

9

at *9–10 (holding evidence sufficient in aggravated assault case because the jury could have chosen to believe complainants' testimony rather than defendant's statements to the police); *see also Zimmerer*, 2023 WL 6152466, at *6–7 (holding evidence sufficient when jury chose to believe complainant's testimony over defendant's claim of innocence); *Rickard*, 2019 WL 4866037, at *5 (holding evidence sufficient when jury chose to believe complainant's testimony over defendant's assertions of innocence).

The evidence was thus sufficient to support Hopkins's conviction, and because it was, the trial court did not err by denying Hopkins's motion for a directed verdict. We overrule Hopkins's sole issue.

## IV. Conclusion

Having overruled Hopkins's sole appellate issue, we affirm the trial court's judgment of conviction. Tex. R. App. P. 43.2(a).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: May 30, 2024