

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00053-CR

_____

TERESA LATHEM, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 362nd District Court
Denton County, Texas
Trial Court No. F-2013-1905-D

Before Kerr and Birdwell, JJ.; and Lee Ann Dauphinot (Senior Justice, Retired, Sitting by Assignment).
Memorandum Opinion by Justice Dauphinot

**MEMORANDUM OPINION**

In 2015, a jury convicted Appellant Teresa Ann Lathem of six counts of criminal solicitation to commit capital murder.[1] Appellant appealed her convictions to this court, which in 2017 reversed her convictions on all six counts and remanded her cause to the trial court.[2] On remand, the jury again convicted her of all six counts of criminal solicitation to commit capital murder and assessed her punishment for each count at life imprisonment. In addition, the jury assessed an $8,000 fine on each count. In accordance with the jury's verdict, the trial court sentenced Appellant to concurrent life sentences for each count and a total fine of $8,000.

Appellant brings one issue on appeal challenging the sufficiency of the evidence to support her convictions. Within her issue, Appellant argues that the evidence is insufficient to support a conviction on each count because the testimony of the person she first solicited—George Brethowr—was not adequately corroborated and because "she never reached the point of setting any plot in motion"; therefore, her actions do not show a desire that Brethowr and a second person—Texas Ranger Stephen Reynolds—would actually carry out her plan. She also argues that the convictions for counts II, IV, and VI—for soliciting Reynolds—cannot stand because the record shows that she did not seek out Reynolds and that she objected to his

---

[1]Tex. Penal Code Ann. §§ 15.03(a), 19.03(a)(3).

[2]*Lathem v. State*, 514 S.W.3d 796, 816 (Tex. App.—Fort Worth 2017, no pet.).

2

participation in her formulated-but-not-acted-upon plans. Because the evidence is sufficient to support Appellant's convictions for all six counts of the indictment, we affirm the trial court's judgment.

Brief Facts

Appellant met Curt Hope in the 1990s. They maintained a casual friendship over the next twenty years. Appellant met Curt's family, including his mother Bettye Hope, his sister Tammy Hope, and Tammy's son Dane Hope. Around 2012, Appellant's behavior changed, and she became obsessed with Curt. She told him they were soul mates. Curt responded by explaining that they were just friends.

Appellant's obsession escalated. Without Curt's consent, she incorporated a business with both Lathem and Hope in the name. Curt and the other Hope family members would see her car parked in the neighborhood where Curt and Bettye's and Tammy and Dane's houses were located; Curt lived with his mother, and Tammy and Dane lived on the same street. Sometimes, Appellant would park in their driveways. She would repeatedly call Curt, Bettye, and Tammy from different numbers. Finally, Curt called a police officer he knew to ask for help. The officer told him to tell Appellant explicitly not to contact him or his family again and not to come to their houses. In December 2012, Curt did as the officer had instructed him and told Appellant to stop all contact with him and his family. In response, Appellant showed up at Curt's house while he was away at work; Appellant's appearance scared Bettye.

The police had to ask Appellant to leave. Curt testified that she returned to his house a couple of times after that.

Appellant came to believe that she had to rescue Curt from his family because they had programmed him to continually injure himself. She also suggested his family had cut off Curt's foot, broken his knees and legs, and made him sick. She also believed that Curt's nephew, Dane, had been programmed and that if he were not killed, he would take his grandmother's place abusing Curt.

In 2013, Appellant met George Brethowr at an American Legion hall. He had been drinking and was intoxicated. Appellant approached Brethowr and invited him to shoot pool with her. While they were at the pool table, Appellant told him she had a problem she needed to have dealt with and asked if he wanted to make some money. A little later, she went into detail and told him there were three people she wanted killed.

Brethowr testified that he had served in Vietnam as a Marine and that he was suffering from PTSD when he met Appellant. He said she seemed to know that he was a Vietnam veteran.

Appellant and Brethowr decided to go to Sonic to get something to eat, and Appellant drove. While they were at Sonic, Appellant went into more detail about what she wanted him to do. Brethowr testified that Appellant wanted him to kill three people, one of whom was a fourteen- or fifteen-year-old boy. (The "boy," Dane, was actually eighteen years old.)

4

The next morning, Brethowr started thinking about his conversation with Appellant and decided to call the police. Denton County Sheriff Sergeant Charles McAfee and Texas Ranger Ronald Pettigrew convinced him to arrange another meeting with Appellant and to ask for details about what she wanted him to do. The police set up two recording devices in Brethowr's truck, one in the glove compartment and one that appeared to be a phone that was turned off. Brethowr did not remember whether he had called Appellant, whether she had called him, or whether they had just happened to meet at the American Legion hall. But whatever the circumstance, Appellant got into Brethowr's truck, and the police recorded their conversation. The recording was admitted into evidence as State's Exhibit 1 and published to the jury.

Brethowr reported to Pettigrew that he believed Appellant was serious about having the three people killed. She told him that she could not shoot them with her gun, "at least not without swapping out the barrel[]," because then the shootings could be traced back to her gun. Brethowr testified that Appellant had offered him $8,000 or all the jewelry and cash he could find in the houses when he committed the murders. Appellant wrote down the names of the three people she wanted killed and their addresses. She explained to him how to find their houses and how to get inside.

Pettigrew contacted the Texas Rangers and arranged for Reynolds to assist in the investigation in an undercover capacity. Brethowr and Reynolds met with Appellant, and she discussed the plans to murder Curt's family in detail. She thought

5

fire might be the best plan. Appellant did not want to be involved in the killing because she wanted to have an alibi. After the meeting, Appellant called Brethowr and told him she was upset with his involving Reynolds. She told him that she did not like Reynolds, that he scared her, and that if Reynolds was a police officer, everything would be recorded. She also did not like the fact that Reynolds had questioned the need to kill the boy. Appellant made clear that she wanted to be with Curt, and she needed to kill his entire family because they were standing in her way. Later, Appellant explained that she did not want to deal directly with anyone other than Brethowr.

After Reynolds met with Appellant, a warrant issued for her arrest. Deputy Sheriff Coats executed a search warrant of Appellant's vehicle and found documents with Curt's name on them, as well as a Secretary of State certification for Lathem–Hope Management, LLC. Deputy Kish executed a warrant to search Appellant's home. There, Kish found tranquilizing darts, syringes, coolers, clear bags, plastic sheets, clamps, steel bowls, a rubber apron, surgical gloves, a rotary saw, a surgical knife, a face shield, medical scissors, a drill, and a container of acid. Additionally, Kish found a concealed handgun license issued to Appellant. Notebooks and documents referencing brainwashing and the Illuminati were found among Appellant's possessions. No handwriting analysis was done of the notebooks.

<u>Sufficiency of the Evidence</u>

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt.[3] This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.[4]

The factfinder alone judges the evidence's weight and credibility.[5] We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's.[6] Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict.[7] We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution.[8]

---

[3]*Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017).

[4]*Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.

[5]*See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622.

[6]*Queeman*, 520 S.W.3d at 622.

[7]*Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence.").

[8]*Murray*, 457 S.W.3d at 448–49.

To determine whether the State has met its *Jackson* burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by the hypothetically correct jury charge to the evidence adduced at trial.[9] Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.[10] The "law as authorized by the indictment" means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument.[11]

Corroboration of Brethowr's Testimony About Solicitation

Section 15.03 of the Texas Penal Code provides in pertinent part that

(a) A person commits an offense if, with intent that a capital felony or felony of the first degree be committed, he requests, commands, or attempts to induce another to engage in specific conduct that, under the circumstances surrounding his conduct as the actor believes them to be, would constitute the felony or make the other a party to its commission.

(b) A person may not be convicted under this section on the uncorroborated testimony of the person allegedly solicited and unless

---

[9] *See Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016); *see also Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("The essential elements of an offense are determined by state law.").

[10] *Jenkins*, 493 S.W.3d at 599.

[11] *See id.*; *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

8

the solicitation is made under circumstances strongly corroborative of both the solicitation itself and the actor's intent that the other person act on the solicitation.

. . . .

(d) An offense under this section is:

(1) a felony of the first degree if the offense solicited is a capital offense[12]

Committing murder for remuneration or employing another to commit murder in exchange for remuneration is a capital offense.[13]

We have listened to the recordings the jury heard of Appellant's discussions of her plans to have Brethowr and Reynolds kill Bettye, Tammy, and Dane Hope. We have heard her detailed description of the location of Bettye's and Tammy's homes. We have seen in State's Exhibit 2 the note she gave to Brethowr setting out the names of the people she wanted killed and pertinent information about their locations. Based on the foregoing, we hold that the evidence of Appellant's solicitation of both Brethowr and Reynolds was adequately corroborated to satisfy the mandates of Section 15.03(b) of the Texas Penal Code.

Overall Sufficiency of the Evidence of Solicitation

Appellant testified on her own behalf and denied having a romantic interest in Curt or wanting to kill his family. She testified that she did not remember asking

---

[12]Tex. Penal Code Ann. § 15.03.

[13]*Id.* § 19.03(3).

9

Brethowr to kill anybody. She denied that she had $8,000 and said that the Hope family had no money. It made no sense to her that she would offer anyone money.

Appellant argues that she was merely voicing her problems with the Hope family and that although she wanted them "eliminated" from her life, there is no evidence corroborating a desire for Brethowr or Reynolds to carry out any theoretical plan to kill them. Appellant points to the fact that she never set a date, never set a plan in motion, and never showed either Brethowr or Reynolds money or proved to them that she had the $8,000 she had offered them to commit the murders. The record reflects, though, that Appellant assured Brethowr that there was jewelry and money in the Hopes' houses and gave him the choice of an $8,000 payment or keeping what he found in the houses. She told Reynolds that he would receive his payment from Brethowr. Brethowr had told her that he and Reynolds were long-time friends. Whether Brethowr demanded proof of payment in advance of the murders goes to his state of mind, not to Appellant's.

Appellant also argues that the evidence is insufficient to support the jury's guilty verdict regarding the three counts of the indictment alleging that she solicited Reynolds to commit capital murder because she told Brethowr she did not like Reynolds and was afraid of him. We have carefully listened to the recordings of her conversation with Reynolds and her discussion with Brethowr about Reynolds. Appellant clearly discussed the murders of Bettye, Tammy, and Dane Hope with Reynolds. She discussed with him the best way to commit the murders, and she

10

explained to him that she thought it would be best to make the murders look like an accident. She suggested a fire during a time she would have an alibi. She told him he would receive his money from Brethowr. Although Appellant expressed her dislike and fear of Reynolds to Brethowr afterward, it is unclear whether Appellant was telling Brethowr she did not want Reynolds to commit the murders or that she did not want to deal directly with him but, rather, wanted to deal through Brethowr. Nevertheless, whatever her doubts and concerns were after her conversation with Reynolds, she clearly had solicited him to commit the capital murders of Bettye, Tammy, and Dane Hope during that conversation.

The jury heard Appellant's voice on the recordings, examined the exhibits that were admitted into evidence, heard all the testimony in the case, and had the opportunity to observe the demeanor and to determine the credibility of the witnesses. There was evidence that Appellant solicited both Brethowr and Reynolds to murder Bettye, Tammy, and Dane for either an $8,000 payment or jewelry and cash found in the Hopes' homes. The evidence consisted not only of testimony and photographs of items found in her home and vehicle, but of recordings of Appellant's own words and notes written by her.

Considering the entire record and applying the appropriate standard of review, we hold the evidence is sufficient to support the jury's verdict as to all six counts of the indictment. We overrule Appellant's sole issue and affirm the trial court's judgment.

11

/s/ Lee Ann Dauphinot
Lee Ann Dauphinot
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  October 1, 2020