

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-20-00048-CR
No. 02-20-00049-CR

———————————————

OTIS DON TROTTER, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 372nd District Court
Tarrant County, Texas
Trial Court Nos. 1546892D, 1546894D

Before Sudderth, C.J.; Birdwell and Walker, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

## I. Introduction

At a crowded gas station on an early evening in May, Appellant Otis Don Trotter fired a gun several times at his nemesis's retreating vehicle. At least three shots ricocheted off a passing vehicle, and one of the bullets grazed a bystander across the street. *See* Tex. Penal Code Ann. § 22.02(a)(2). A jury found Trotter guilty of aggravated assault with a deadly weapon (firing at his nemesis) and guilty of the lesser-included offense of reckless aggravated assault with a deadly weapon (grazing the bystander). The trial court assessed concurrent twenty-five-year sentences as punishment.[1]

In four points, Trotter argues that the evidence is insufficient to support his conviction of the lesser-included offense; that the trial court committed jury-charge error by including the lesser-included-offense instruction and by failing to include a self-defense instruction; and that the trial court abused its discretion by admitting improper lay opinion testimony. We affirm.

---

[1]Trotter pleaded true to the State's repeat-offender notice and stipulated to his criminal history. *See* Tex. Penal Code Ann. §§ 12.32, .42.

## II. Background

Trotter and Austin Wade had been friends for twenty years, but on the evening of May 23, 2018, according to Wade, they fought over the same woman's affections.[2] Wade claimed that Trotter hit him first, and they exchanged punches until Wade pulled a box cutter from his pocket and "poked" Trotter with it "a couple of times."

Lee Moore, who witnessed the altercation, testified that he had been talking with Trotter at the Z Mini Mart when Wade showed up in a heated and excited state, exchanged a few words with Trotter, and then took a swing at Trotter. When Trotter pushed back, Moore stepped between them and pulled Wade away. He then heard Trotter yell, "He cut me." Moore said that Trotter was "bleeding real bad," and video from a responding police officer's body camera showed that Trotter was bleeding from cuts on his arms and chest. Wade had left the scene, and Trotter told the officer that he had cut himself by trying to jump a nearby chain-link fence.

Wade said that after midnight that evening, Trotter found him in his truck with a different woman and that Trotter threatened him with a silver handgun. Wade's companion covered Wade with her body and told Trotter to leave or she would call the police. After threatening Wade, Trotter "bust[ed] out" some of the truck's windows, showering Wade and his companion with broken glass, and then left.

---

[2]During the punishment trial, Trotter's wife testified that she had been present for some of the men's arguments, that there was no other woman, and that the dispute between Trotter and Wade had been about something else.

Wade's companion called the police, who took photos of the truck's shattered windows.

Three days later, on a beautiful Saturday evening at 6 p.m.,[3] Wade stopped at pump 3 of the Valero gas station and convenience store at the intersection of Sycamore School Road and Everman Parkway. The Valero's neighboring businesses included a smoke shop and two fried chicken restaurants, in addition to a dental office and a Family Dollar across the street. Trotter and his stepson Sederick Campbell stopped at the Valero at the same time as Wade. Campbell said that it had been his idea to stop and that he had not known Wade was going to be there.

After Wade entered the convenience store, Trotter emerged from Campbell's black Charger, opened and closed the trunk, and then walked into the convenience store, stuck a cigarette in his mouth, and walked back out. Wade, who had been standing in line, saw Trotter in the doorway and said that Trotter had "smok[ed] . . . his cigarette and g[ave] [Wade] a look" before backing out. Wade testified that he could see the shape of a gun in Trotter's pocket.

After Wade returned to his truck, Trotter approached the truck's driver's side window, and they briefly conversed. Campbell described Wade as "standing there yelling" at Trotter while digging into his truck's door compartment.

---

[3]The surveillance and body camera footage and photographs taken at the scene show that the weather was clear and sunny.

4

Wade stated that Trotter had asked him if he had a gun and that he told Trotter that he did not and then told Trotter to leave. Wade said that Trotter had seemed angry and had talked about how Wade had "dissed him." He denied that he had pulled out his box cutter and asked Trotter if he wanted some more of it. Wade said that he was halfway into his truck's driver's seat when Trotter dug into his pocket for his gun. Wade stated that he put the truck into reverse as Trotter fired five or six times.[4]

Campbell said that he did not see Wade hold a weapon that day and that although Wade had threatened them, he did not hear Wade say that he was going to kill them or shoot them. He nonetheless testified about being afraid "because [he] knew what [Wade] had done to [Trotter]" and worried that Wade, who was "talking gang talk to [Trotter]," might have a weapon or might try to run over Trotter. He testified as follows:

> Q. Okay. And so as [Wade] is trying to pull something out of his front car door, what do you do?
>
> A. I – I grab [Trotter] once and I took off running to the car.
>
> Q. Did you take [Trotter] with you?

---

[4]At the Valero, the police found four spent shell casings, which were admitted into evidence. The police department's crime-lab expert examined the four casings, the .25-caliber gun recovered from the passenger side of Campbell's Charger, and the gun's magazine, which could hold seven cartridges in addition to one in the gun's chamber, and the expert confirmed that the gun had fired the four casings found at the Valero. The officer who had picked up the gun testified that there were no remaining rounds in the gun's magazine or chamber.

A. I thought he was running right behind me. I don't know. I was trying to hurry up and get in my car.

Q. Okay. So at this point you turned around and you don't have your face to [Wade]?

A. No.

Q. Okay. What happened after you turned around and were going back to your car?

A. By the time I had got up to my door, I had heard gunshots.

Q. Okay. And you were sprinting to your car?

A. I was running. I was trying to get out of there.

Q. And at the time, you had no idea where those gunshots came from; is that right?

A. No, sir.

Q. Okay. And what did you do after you got in your car?

A. As soon as I got in, [Trotter] got in, in the car, and we had – we proceeded to leave out and that's when I [saw] the police officer. . . .

Q. So you pulled over as soon as you saw the police officer?

A. Yes. As soon as I s[aw] him, I pulled over.

Q. Were you relieved when you saw the police officer?

A. Yes.

Q. Because you were afraid?

A. Yes.

Q. Okay. Okay. When you saw [Wade] reaching into his car for something, you stated that you were afraid; is that right?

6

A. Yes.

Q. Okay. Did you think that [Wade] was going to hurt you?

A. It was possible because he had already hurt my stepfather.

Q. Did you think that he might have killed you or your stepfather?

A. Yes.

Q. Is that why you ran?

A. Yes. . . . I felt like he was going to shoot at us and try to . . . kill both of us.

However, Campbell testified during cross-examination that when he first saw Wade inside the convenience store, he had slowly walked away, stating, "I didn't fe[el] no reason to run to the car at that point. Like . . . it wasn't that kind of fear" because there were so many witnesses around. During his testimony, Wade acknowledged his 2009 conviction for aggravated assault with a deadly weapon and his 2007 misdemeanor assault conviction, as well as his 2014 forgery conviction. He also stated that he was five feet, four inches tall, that he weighed 140 pounds, and that Trotter was almost twice his weight.

Three of the shots that Trotter fired in the direction of Wade's truck ricocheted off Reverend Clayton Jones's vehicle as the reverend drove past the Valero. The aerial map of the intersection, combined with Jones's testimony, indicates that his car was initially in the lane of traffic nearest to the Valero when the three shots ricocheted.

7

Jones testified that a fourth shot penetrated his car's passenger door, making "a big boom" and shaking the car.[5] Body camera footage from a responding police officer, combined with the aerial map and photographs taken at the scene, illustrates that pump 3, where Wade had been parked before the shooting began, is across from the Family Dollar just before the roadway begins to widen for a second left-hand turn lane. Jones said that there were people around the Valero and neighboring establishments, and the Valero surveillance video corroborates his testimony.

Across the street from the Valero, Carlos Torrez had been walking to his car with a kiddie pool from the Family Dollar when he heard the "pop, pop, pop, pop, pop" sounds of "legit gunshots" and felt something strike him in the head. Torrez testified that his head had been grazed by one of the bullets fired from across the street and that it made him bleed and left him with a huge and painful "knot." He described the feeling of being struck as being hit with a brick. Emergency medical technicians treated Torrez at the scene with a gauze pad to stop the bleeding. They let him go home after he refused to go to the emergency room. Photos of Torrez's injuries were admitted into evidence and published to the jury.

Fort Worth Police Officer Brandon Lance, who was responding to an earlier incident at the Valero, arrived immediately after the shooting. Wade flagged him

_____

[5]Jones said that when his car shook, he "said a little prayer and just kept going" without looking back until he got home; he also sped up and moved his vehicle into the lane farther from the Valero. Although his wife called 911, the police did not respond, and the State offered no photos of Jones's vehicle.

down, pointed at Trotter, and shouted that Trotter had shot at him, and Officer Lance stopped Campbell's Charger. Wade drove back to the gas pump and gave the police his version of events. Trotter told Officer Lance that there was a .25-caliber firearm in the Charger, and when Officer Lance searched the Charger, he found the handgun on the passenger-side floorboard.

When the prosecutor asked Officer Lance if a .25-caliber handgun could fire a projectile across the street to the Family Dollar, Trotter's counsel objected and, during voir dire, elicited Officer Lance's admission that he had no specific expertise on that caliber of weapon's effective range. The trial court sustained the objection but allowed Officer Lance to testify that in his experience with firearms in general, it was possible for a firearm to fire a bullet across the five-lane street and that it could be unpredictable where a bullet might end up. Officer Lance also said that it was possible in a multiple-round shooting to be unable to locate one of the bullets. He did not find a bullet across the street and did not know if anyone else had found one. During cross-examination, Officer Lance said that he could not tell what a bullet's trajectory would be based on where its casing was found.

### III. Discussion

## A. Evidentiary Sufficiency

In his first point, Trotter argues that there was no testimony that a bullet could travel the distance required to graze Torrez, no testimony that the recovered weapon

was capable of firing a round that far, and no expert testimony that Torrez was actually struck by a bullet.

## 1. Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017).

Under the *Jackson* test, a jury may draw multiple reasonable inferences if each inference is supported by the evidence presented at trial. *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007). In *Hooper*, the court explained the distinction between reasonable inference and speculation in a hypothetical:

> A woman is seen standing in an office holding a smoking gun. There is a body with a gunshot wound on the floor near her. Based on these two facts, it is reasonable to infer that the woman shot the gun (she is holding the gun, and it is still smoking). Is it also reasonable to infer that she shot the person on the floor? To make that determination, other factors must be taken into consideration. If she is the only person in the room with a smoking gun, then it is reasonable to infer that she shot the person on the floor. But, if there are other people with smoking guns in the room, absent other evidence of her guilt, it is not reasonable to infer that she was the shooter. No rational juror should find beyond a reasonable doubt that she was the shooter, rather than any of the other people with smoking guns. To do so would require impermissible speculation. But, what if there is also evidence that the other guns in the room are toy guns and cannot shoot bullets? Then, it would be reasonable to infer that no one with a toy gun was the shooter. It would also be reasonable to infer that the woman holding the smoking gun was the shooter. This would require multiple inferences based upon the

same set of facts, but they are reasonable inferences when looking at the evidence. We first have to infer that she shot the gun. This is a reasonable inference because she is holding the gun, and it is still smoking. Next, we have to infer that she shot the person on the floor. This inference is based in part on the original inference that she shot the gun, but is also a reasonable inference drawn from the circumstances.

*Id.* at 16.

A person commits an assault if he intentionally, knowingly, or recklessly causes bodily injury to another. Tex. Penal Code Ann. § 22.01(a)(1). The assault becomes "aggravated" if, during the assault's commission, the assailant either causes serious bodily injury to another or uses or exhibits a deadly weapon. *Id.* § 22.02(a). A person acts "recklessly" when he is subjectively aware of a substantial and unjustifiable risk that specific circumstances exist and consciously disregards that risk. *Romano v. State*, 610 S.W.3d 30, 35 (Tex. Crim. App. 2020) (citing Tex. Penal Code Ann. § 6.03(c)). The risk must be of such a nature and degree that it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint. *Id.* (citing Tex. Penal Code Ann. § 6.03(c)). By its nature, a culpable mental state must generally be inferred from the circumstances; because we cannot read an accused's mind, absent a confession, we must infer his mental state from his acts, words, and conduct. *Id.*

## 2. Evidence of Reckless Aggravated Assault with a Deadly Weapon

Torrez heard gunfire and testified that he was hit in the head by something that felt "like a brick" while Trotter was across the street, firing shots at Wade's truck and

11

hitting Jones's car as Jones drove between the Valero and the Family Dollar. The impact of the bullet that lodged in Jones's car door was hard enough to shake the car. The photographs; body camera footage; and testimony by Wade, Campbell, and Torrez, among others, show that Trotter fired a gun several times in an area where other potential victims were around.

### 3. Analysis

There is no dispute on appeal that Trotter fired a gun at least four times in the general direction of the Family Dollar and, based on Wade and Torrez's testimonies (and the size of the gun's magazine), Trotter could have fired it up to six times. *Cf. Hooper*, 214 S.W.3d at 16. There was also evidence that Torrez was in the Family Dollar parking lot when he was hit in the head with something while Trotter was firing the gun; that at least one shot fired from the gun had sufficient force to shake Jones's vehicle in its relatively closer proximity to the weapon; and that three other shots bounced off Jones's vehicle. Could a rational jury reasonably infer under these circumstances, without additional testimony, either that Trotter had fired more than four bullets and one grazed Torrez or that one of the three bullets fired from Trotter's weapon that ricocheted from Jones's vehicle had grazed Torrez's head? We conclude that the jury could reasonably draw such conclusions in the absence of evidence that

12

anyone else was flinging projectiles near Torrez's head at that time and in that area.[6]
*See id.*

We likewise conclude that the jury could have reasonably concluded that Trotter's action of firing several times in an area with other people around—at 6 p.m. on a sunny Saturday at a gas station and convenience store located next to two fast-food restaurants and across the street from a Family Dollar—was reckless. *See Romano*, 610 S.W.3d at 31, 35 (holding that the evidence was sufficient to find appellant recklessly exposed his genitalia when he was in a public park in the middle of a clear summer day "in densely-populated Houston in a parking lot that was open and visible to passing road traffic, bicyclists and pedestrians, and anyone using the public restroom facilities or picnic tables immediately nearby"); *see also State v. Rodriguez*, 339 S.W.3d 680, 683–84 (Tex. Crim. App. 2011) (listing as examples of disregard of a known and unjustifiable risk: shooting into the ground in a crowd of people, shooting into the air or at beer bottles in a residential district, shooting at a stop sign in a business district, and shooting into the bushes at a city park); *Ishmael v.*

---

[6]As the trial court observed when it denied Trotter's directed-verdict motion, when viewed in the light most favorable to the State's case, a rational jury could find that Torrez had been struck with one of Trotter's bullets based on "the descriptions given, what was pointed out on photographs and maps . . . [and] [i]n light of the timing of the sounds, the shots[,] and all the other witnesses who were impacted in the same line of trajectory, with the car and his location." Further, the jury notes reflect that during deliberations, the jury requested the photos of Torrez's head injury and the aerial map of the streets and buildings at 11:20 a.m. and additional evidence from the videos at 12:01 p.m. By 1:15 p.m., the jury had announced that it had reached a verdict.

*State*, 688 S.W.2d 252, 258 (Tex. App.—Fort Worth 1985, pet. ref'd) ("When a person fires a gun into a crowd of people with no particular intended victim, the probability that serious bodily injury will result is so great that it is worse than reckless disregard of the consequences; if a death is thus caused, it is murder.").

Accordingly, we hold that the evidence is sufficient to support the jury's verdict without expert testimony that Torrez had been struck by a bullet (as opposed to something else) and without additional testimony about how far bullets fired from the gun could be expected to travel. We overrule Trotter's first point.

## B. Jury Charge

In his second and third points, Trotter argues that the trial court committed jury-charge error by including the lesser-included-offense instruction and by denying his requested self-defense instruction. We must review "all alleged jury-charge error . . . regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). If no error occurred, then our analysis ends. *Id.*

### 1. Lesser-Included Offense

Trotter was charged with intentional or knowing aggravated assault with a deadly weapon. However, if recklessness is raised by the evidence, a trial court does not err by submitting a charge on reckless aggravated assault as a lesser-included offense of a charged intentional or knowing aggravated assault. *Gonzalez v. State*, 610 S.W.3d 22, 28 (Tex. Crim. App. 2020); *see generally* Tex. Code Crim. Proc. Ann. arts. 37.08 (providing for lesser-included offenses), 37.09(3) (stating that an offense is a

14

lesser-included offense "if it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission").

Trotter contends in his second point that there "was no testimony or evidence of a conscious disregard of a known risk" to warrant the lesser-included-offense instruction on reckless aggravated assault with a deadly weapon.

We disagree. As set out above in our sufficiency analysis, the record reflects that Trotter fired several times in a crowded public area[7] on an early Saturday evening in May and, while he missed hitting Wade, his targeted victim, he managed to hit Jones's vehicle and graze Torrez's head. *See Romano*, 610 S.W.3d at 35; *Rodriguez*, 339 S.W.3d at 683–84; *Ishmael*, 688 S.W.2d at 258; *see also* Tex. Penal Code Ann. § 1.07(a)(17)(A) (defining a firearm as a deadly weapon), § 22.05(c) ("Recklessness and danger are presumed if the actor knowingly pointed a firearm at or in the direction of another whether or not the actor believed the firearm to be loaded."). Accordingly, there was sufficient evidence to include the lesser-included-offense instruction in the jury charge, and we overrule Trotter's second point.

---

[7]During closing arguments, Trotter argued, "You know from the video that the gas station was packed. . . . You know that this was a busy gas station with a lot of people." And Campbell testified that he was not initially afraid when he saw Wade at the Valero because they were in an area with "a lot of witnesses."

## 2. Self-Defense

In his third point, Trotter argues that there was sufficient evidence to raise self-defense as part of the law applicable to the Wade case.[8]

A defendant is entitled to an instruction on any defensive issue that is raised by the evidence regardless of the evidence's strength or credibility. *Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020). A defensive issue is raised by the evidence if there is sufficient evidence to support a rational jury finding as to each element of the defense, and we view the evidence in the light most favorable to the defendant's requested defensive instruction. *Id.*

Self-defense is a confession-and-avoidance defense requiring the defendant to admit to his otherwise illegal conduct. *Id.* He cannot both invoke self-defense and flatly deny the charged conduct. *Id.* Further, a person is only justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. *See id.* (citing Tex. Penal Code Ann. § 9.31(a)). And he is justified in using

---

[8]During the charge conference, Trotter conceded, "[W]e do not have a basis for saying that we shot Mr. Torrez in self-defense." *See generally* Tex. Penal Code Ann. § 9.05 (providing that even though an actor may be justified in threatening or using force or deadly force against another, "if in doing so he also recklessly injures or kills an innocent third person, the justification afforded by this chapter is unavailable in a prosecution for the reckless injury or killing of the innocent third person").

deadly force[9] against another only if he would be justified in using force under Penal Code Section 9.31[10] and reasonably believes that deadly force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force. *See id.* (citing Tex. Penal Code Ann. § 9.32(a)). A trial court errs by refusing a self-defense instruction if there is some evidence, viewed in the light most favorable to the defendant, that will support its elements. *Id.*; *see Bedolla v. State*, 442 S.W.3d 313, 315, 317 (Tex. Crim. App. 2014) (stating that when the appellant was charged with aggravated assault with a deadly weapon based on his having run over the complainant with his car, self-defense with deadly force was the only defense that would justify his conduct).

Trotter directs us to the following evidence to support his argument that he was entitled to a self-defense instruction:

- Wade's having sliced Trotter with a box-cutter blade after the two men engaged in fisticuffs three days before the incident at the Valero;

- Wade's confirming his 2009 aggravated-assault-with-a-deadly-weapon conviction and his 2007 assault conviction; and

---

[9]"Deadly force" means "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." Tex. Penal Code Ann. § 9.01(3).

[10]Penal Code Section 9.31 prohibits the use of force against another in response to verbal provocation alone. Tex. Penal Code Ann. § 9.31(b)(1). It also states that the use of force is not justified if the actor provoked the other's use or attempted use of unlawful force unless the actor then abandons the encounter or clearly communicates to the other his intent to do so. *See id.* § 9.31(b)(4).

- Campbell's testifying that he was afraid that Wade might have a weapon or might try to run over Trotter when he saw Wade at the Valero.

We review this evidence in the light most favorable to Trotter to determine if the trial court erred. *See Jordan*, 593 S.W.3d at 343.

The record reflects that there may have been verbal provocation by Wade during the Valero encounter, but verbal provocation alone is insufficient to justify a self-defense instruction. *See* Tex. Penal Code Ann. § 9.31(b)(1). And while Campbell testified that he was not initially afraid but then became afraid—and proved it by fleeing back to his vehicle before Trotter fired the shots—nothing in the record illustrates *Trotter*'s state of mind or that there was anything for Trotter to fear when Campbell testified that he did not see Wade hold a weapon that day or hear Wade threaten to kill or shoot them, and *Trotter*, armed with a gun, approached Wade at the gas pump.

The Valero's surveillance video, which has no audio, shows Trotter calmly emerge from the passenger side of his stepson's vehicle, open the trunk, close the trunk, walk into the convenience store, leave the convenience store, and then engage Wade in conversation outside the convenience store before firing his weapon at Wade's departing vehicle.[11] Nothing in this record supports that Trotter's use of deadly force was immediately necessary to protect himself from Wade or that Wade

---

[11]During the charge conference, Trotter argued that he was entitled to a self-defense instruction even though "firing at a car that's backing up . . . might not make the self-defense perfect or might not make it reasonable."

18

was imminently going to harm Trotter. *Cf. id.* § 9.32(a)(2), (b)(1). And even when Wade had actually harmed Trotter during their altercation at a different convenience store three days before the shooting, Trotter told the police that he had injured himself trying to climb a fence and said nothing about his altercation with—or fear of—Wade. Instead, according to Wade, Trotter threatened him with a gun later that evening, broke some of his truck's windows, and showered him in broken glass.

Further, as the State points out in its appellate brief and as it argued in response to Trotter's request for the self-defense instruction, the defense's theory at trial had been to challenge whether Trotter had even fired the gun rather than attempt to confess to the offense and then avoid it through self-defense.[12] *See Jordan*, 593 S.W.3d at 343. Based on the above, we conclude that the trial court did not err by denying Trotter's request for a self-defense instruction, and we overrule his third point.

## C. Preservation

In his final point, Trotter argues that the trial court abused its discretion by admitting lay opinion testimony. *Compare* Tex. R. Evid. 701 (stating that lay witness testimony is limited to that which is rationally based on the witness's perception and helpful to clearly understand the witness's testimony or to determine a fact in issue),

---

[12]Trotter opened fire outside of the range of the Valero's surveillance cameras; accordingly, only Wade's testimony, the location of four of the firearm's spent casings, and the expert's testimony that the casings matched the gun found on Campbell's floorboard supported identifying Trotter as the shooter. During closing arguments, Trotter relied on this evidence to argue that only Wade had seen him fire the gun, that he had not been tested for gunpowder residue, and that the gun had not been tested for fingerprints or DNA.

*with* Tex. R. Evid. 702 (stating that a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion if his scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue).

Specifically, Trotter complains that the trial court should not have admitted testimony about Torrez's "gunshot" wound when the jury "would not fully understand the evidence or be able to determine *the fact* in issue without the assistance of someone with specialized knowledge that must be qualified as an expert." He complains that nothing was presented about Torrez's background to establish that he could opine that he had been shot and that no qualified witness had determined that Torrez had sustained a gunshot wound.

The State responds that Trotter failed to preserve this complaint because Torrez had testified several times that he was either grazed or hit by a "bullet" by the time Trotter objected to Torrez's testimony that he was struck by a bullet, and Trotter did not object to any of these earlier instances.

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion stating the specific grounds, if not apparent from the context, for the desired ruling. Tex. R. App. P. 33.1(a)(1); *Thomas v. State*, 505 S.W.3d 916, 924 (Tex. Crim. App. 2016). A party must object as soon as the basis for the objection becomes apparent. Tex. R. Evid. 103(a)(1); *London v. State*, 490 S.W.3d 503, 507 (Tex. Crim. App. 2016); *see Saldano v. State*, 70 S.W.3d 873, 889

20

(Tex. Crim. App. 2002) ("We have consistently held that the failure to object in a timely and specific manner during trial forfeits complaints about the admissibility of evidence."). Generally, a party must object each time the objectionable evidence is offered. *Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003); *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003); *Clay v. State*, 361 S.W.3d 762, 766 (Tex. App.—Fort Worth 2012, no pet.).

During the State's direct examination, Torrez testified about his injury:

> Q. And as you got there -- did you already buy the pool before you were grazed by that bullet?
>
> A. Yes.
>
> . . . .
>
> Q. . . . And just above your left ear there's a mark and some blood. Is that where you were grazed by that bullet?
>
> A. Yes.
>
> . . . .
>
> Q. And then here we see, again, above the left side of ear, a mark with some blood. Is that where the bullet hit you?
>
> A. Yes.
>
> Q. Okay. And then kind of on your forehead there's another little mark. Did the bullet also graze there, too?
>
> A. Yes.
>
> . . . .

Q. . . . Was it pretty clear to you that after those gunshots, that you were hit by one of those bullets, or grazed by one of those bullets?

. . . .

[Defense counsel]: Objection. . . . I object on the basis of qualification. The witness isn't qualified to answer.

The trial court overruled Trotter's objection that Torrez was unqualified, stating, "He can give a lay opinion," and "[t]he jury can weigh it as they set fit." *See Clark v. State*, 305 S.W.3d 351, 357 (Tex. App.—Houston [14th Dist.] 2010) (stating that for lay testimony to be based on a witness's perception, the witness must have personally experienced or observed the event and may make reasonable inferences based on his perceptions), *aff'd*, 365 S.W.3d 333 (Tex. Crim. App. 2012).

The record reflects that by the time Trotter objected to the "bullet" testimony, the jury had already had the opportunity to consider it and had viewed the photographs, admitted without objection, of Torrez's wound. Accordingly, we conclude that Trotter failed to preserve this point for our review, and we overrule his final point.

## IV. Conclusion

Having overruled all of Trotter's points, we affirm the trial court's judgments.

/s/ Wade Birdwell

Wade Birdwell
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: September 30, 2021