

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-20-00024-CR

_____

LELANI RUSSELL, Appellant

V.

THE STATE OF TEXAS

_____

On Appeal from County Criminal Court No. 9
Tarrant County, Texas
Trial Court No. 1577615

_____

Before Sudderth, C.J.; Kerr and Wallach, JJ.
Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

Appellant Lelani Russell appeals her conviction for interference with public duties. Russell argues in four points that the evidence is legally insufficient to support the jury's guilty verdict. We affirm.

## I. INTRODUCTION

The first game of the 2018 season for the Dallas Cowboys took place at AT&T Stadium in Arlington on September 16. In addition to the 80,000 or so fans who were converging on the stadium, Russell and several others had arrived to protest recent allegations of police misconduct. Police officers arrested Russell and some of the other protesters for disrupting traffic flow, preventing spectators from entering the stadium, and interfering with emergency-vehicle access. Russell was charged with several counts of interference with public duties. The State waived some of these counts, and Russell stood trial for interfering with the duties of an Arlington police officer by walking through the intersection of Collins and Randol Mill, by interfering with the officer's attempts at crowd control by blocking entrances to the stadium, and by interfering with the driver of an ambulance. A jury found Russell guilty of the intersection-blocking and entrance-blocking counts but acquitted her of interfering with an ambulance driver.[1]

---

[1]Russell was tried for interference with public duties with another protester, Davante Peters. Peters's conviction has already been affirmed by this Court. *See Peters v. State*, No. 02-20-00025-CR, 2021 WL 1800173 (Tex. App.—Fort Worth May 6, 2021, pet. ref'd) (mem. op., not designated for publication).

## II. BACKGROUND

Keith Brooks is the Assistant Director of Public Works and Transportation for Arlington. He testified that he works to control the traffic flow during events at AT&T Stadium. Brooks explained that the major corridors through which the traffic flows to the stadium from Interstate 30 are Collins Street, AT&T Way, and Ballpark Way. He also pointed out that police officers at intersections near the stadium are responsible for pedestrian control, meaning they direct pedestrians as to when they may or may not cross the intersection. Brooks further explained that, on September 16, 2018, a group of protesters "shut down" traffic for about five minutes at the intersection of Randol Mill and Collins before the game.

Sergeant Sebastien Peron works for the Arlington Police Department, specifically as a liaison for the Dallas Cowboys, and he is assigned to AT&T Stadium during events that are held there. His duties on September 16, 2018, were largely confined to inside the stadium, where he stayed in contact with parking, traffic, and interior security operations. He did not have a "fixed assignment" with regard to crowd control, but he would involve himself in outside-of-the-stadium activities "as warranted."

Peron learned that a group of protesters planned to arrive that day, but he did not have any reason to believe that the group would be anything other than peaceful. At around 6:30 pm on gameday, Peron stepped outside of Entry A to observe the group of protesters. A smaller group of protesters broke away and started walking

3

towards Gates B, C, and D. Once there, the group began to form a "human chain," holding hands, extending their arms, and chanting slogans. Because this chain began to affect the ability of football fans to enter the stadium efficiently, Peron began to fear for the safety of the protesters from possibly agitated and inconvenienced fans. He therefore called for more officers to move into the area.

According to Peron, the continued demonstrations and the protesters' interference with the fans' ingress into the stadium took officers away from their primary responsibilities. As for Peron himself, his primary responsibility was "going around and checking the different entries and gates to ensure that our officers were standing and manning these gates as they were instructed to do because often times during NFL games the stadium or the venue will get audited by the NFL." Though he often had to perform these duties inside the stadium, the protesters' actions forced him to step outside to help with traffic management, crowd control, and emergency vehicle access.

The protesters eventually left Gates B, C, and D and formed another human chain at Gates H, J, and K. They then drifted toward the intersection of Collins and Randol Mill, crossing six lanes of traffic without using a crosswalk. This is a busy intersection, especially so on game days. Peron testified that the group of protesters interfered with his and other officers' ability to do their jobs because they were unable to move pedestrians and vehicles efficiently through the intersection.

Assistant Fire Chief Gerald Randall also testified. As deputy chief of special events, Randall oversees firemen, EMS personnel, medical services, and others who respond to emergencies. He said that the group of protesters at the intersection of Randol Mill and Collins interfered with his ability to move vehicles to and from emergencies. Specifically, Randall recalled that one of the ambulances was unable to get through the intersection to assist with a chest pain call. In general, according to Randall, the protesters "were blocking traffic in all different directions. The police were doing their best to try to manage that."

Russell testified. She said that she had gone to Arlington to protest and "bring awareness" to two recent police shootings. Russell's goal was not to be arrested, and she said that the group was willing to do what was requested by police officers, including leaving the property. Russell also testified that while the protesters stood in front of the entry gates, another entrance was opened so that fans could enter the stadium. It was not her intent to stop traffic at the intersection and, indeed, vehicles and pedestrians were able to "get through." Russell denied walking outside the crosswalk at the intersection or even jaywalking. She also denied preventing any emergency vehicles from traversing the intersection.

## III.   DISCUSSION

Russell alleges that the evidence is insufficient to support her conviction. Specifically, she argues that: (1) there is no evidence that she actually interfered with any of Peron's duties when she and the other protesters walked through an

intersection; (2) there is no evidence that she actually interfered with Peron's duties when he was trying to manage crowd control; (3) there is a "fatal variance" between the allegations and the proof at trial with regard to whether she was walking through the intersection of Collins and Randol Mill; and (4) there is a "fatal variance" between the allegations and the proof at trial with regard to whether she was interfering with Peron's duties by standing in front of entrances to the stadium.

## A. Legal Sufficiency and Applicable Law

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017).

This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light

6

most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Id.* at 448–49.

Section 38.15 of the Penal Code criminalizes the act of interfering with public duties: "A person commits an offense if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law." Tex. Penal Code Ann. § 38.15(a)(1). "The act requirement of the statute is broad and includes interrupting, impeding, disrupting, or otherwise interfering with the performance of official duties." *Carney v. State*, 31 S.W.3d 392, 395–96 (Tex. App.—Austin 2000, no pet.). Russell was charged by way of information with several counts of interfering with a public duty.[2] Count six alleged that Russell interfered with the duties of Sergeant Peron by walking through the intersections of Collins and Randol Mill. Count eight alleged that Russell interfered with Peron's duties by standing in front of entries B, C, D, H, and/or J of AT&T Stadium.

## B. Interfering with Peron's Duties Regarding Traffic Control

Russell claims that the State failed to prove that her actions at the intersection of Randol Mill and Collins could have constituted an interference with police duties.

---

[2]The State proceeded on only three counts of a nine-count information. Russell was acquitted of the offense alleged in count five.

She also asserts that there was no proof that Peron was actually performing any duties imposed by law. Russell is mistaken.

Peron positively identified Russell as one of the protest's participants at Gates B, C, D, H, and J. He responded affirmatively when asked if that same group departed Gates H, J, and K and made their way to the intersection of Collins and Randol Mill. When asked whether the group, which included Russell, had "essentially, interfere[d] with [his] ability or duty to help with traffic control," Peron answered that it did. Peron testified that "both defendants' actions" disrupted the officers' "ability to effectively move both pedestrians and cars in a safe and timely manner during that time."

As Russell points out, Peron's *normal* duties do not include the flow of pedestrian and auto traffic. However, on redirect, Peron made clear that his primary duties "changed . . . and adapted" to what was happening outside the stadium:

> [Prosecutor]: So, as an officer, once you walk outside of the gate and you notice some crowds building up, do you also take on the duty of managing and coordinating crowd control, correct?
>
> [Peron]: Yes, ma'am.
>
> [Prosecutor]: And as an officer and sergeant, once you get to an intersection, in this case, Collins and Randol Mill, you then take on the duty to coordinate the flow of traffic, correct?
>
> [Peron]: Yes and no. I mean, the way our command structure is set up out there is that we have interior operation[s] and exterior operations. And so even though I was standing in the middle of the intersection that day, that wasn't my primary responsibility was [sic] to move traffic. I was more focused on the protesters and the individuals standing out in the

8

middle of intersection and trying to determine how we were gonna respond to that.

[Prosecutor]: We understand that while it might not be your primary, you are assisting in that duty, correct?

[Peron]: That's correct, yes.

[Prosecutor]: And, also as an officer and sergeant, once you get to the intersection of Randol Mill and Collins, you also had a duty to help or assist in providing emergency vehicles a clear access way, correct?

[Peron]: Yes, ma'am.

Peron went on to testify that the protesters' actions "impacted the officers' abilities that were assigned to that intersection to effectively move pedestrians and traffic." Thus, even if Peron's ordinary duties did not include managing traffic, the evidence showed that his duties grew to include traffic management after the group arrived at the intersection.

Although Russell denied doing anything wrong at the intersection, including interfering with traffic or breaking any traffic laws, the jury was free to disbelieve her testimony. *See Murray*, 457 S.W.3d at 448. In addition, a rational juror could believe that Peron—whose primary duties would normally confine him to the interior of the stadium—was forced by the protesters' actions to take on the extra duties of crowd control and that these duties were then interfered with by the protesters (which included Russell[3]) when they effectively "shut down" the intersection. Accordingly,

---

[3]Russell argues that the State failed to show that she "personally" participated in acts of interference, presumably because most of the testimony dealt with the group. But the record is clear that Russell was a member of that group. As we held in

the evidence was legally sufficient to support the jury's verdict that Russell interfered with Peron's police duties during her protest at the intersection.

## C. Interfering with Peron's Duties at the Entry Gates

Regarding Russell's protest at the stadium entrance, Peron identified Russell as one of the participants in the protest that occurred at Gates B and C, and then Gates D, H, and J. He testified that the group, when it arrived at entries B, C, and D, formed "a human chain," holding hands and affecting the ability of fans to enter the stadium efficiently. Arriving spectators had to work their way around the chain and were becoming frustrated as a result. Peron became concerned that he might not have the resources to defend the protesters against agitated and frustrated fans. As a consequence, Peron had to request additional officers to come to the gates. Ensuring that fans can get to the game on time is an important consideration, and with the protesters' blocking of the gates impacting the fans' movements, it naturally distracted Peron from his duties inside the stadium. Diverting an officer's attention from his normal duties constitutes an interference under Section 38.15. *Lovett v. State*, 523 S.W.3d 342, 352 (Tex. App.—Fort Worth 2017, pet. ref'd). In other words, Peron and the other officers had to manage and coordinate crowd control *as a result* of the

_____

the opinion affirming the conviction of Russell's co-defendant, "Given Peron's testimony that his duties had grown to include crowd control and that Peters was a part of the group at the intersection, a reasonable inference from Brooks's testimony is that Peters, as part of the group of protestors, interfered with Peron's duties of controlling the crowd." *Peters*, 2021 WL 1800173, at *7.

10

actions of Russell and the other protesters—and, incidentally, make sure that the protesters remained safe.

Again, the jury could credit Peron's testimony and disbelieve Russell's testimony that she (and the other protesters) did not impede the entrance of fans into the stadium. *See Murray*, 457 S.W.3d at 448. The evidence was therefore legally sufficient to support the jury's verdict that Russell's actions at the stadium gates interfered with Peron's duties.

**D.  Material Variance Claims**

Russell also raises two "material variance" claims in tandem with her legal sufficiency points. Neither of these amounts to a variance, much less a material one.

In an evidentiary-sufficiency review, we disregard any immaterial variance between the indictment's allegations and the proof at trial. *Gollihar v. State*, 46 S.W.3d 243, 257 (Tex. Crim. App. 2001); *see Thomas v. State*, 444 S.W.3d 4, 9 (Tex. Crim. App. 2014) ("Immaterial variances do not affect the validity of a criminal conviction, and we have held that a hypothetically correct jury charge need not incorporate allegations that would give rise to only immaterial variances."). The Court of Criminal Appeals has identified three categories of variances, depending on the type of allegation that the State pleaded but failed to prove at trial:

> First, a variance involving statutory language that defines the offense always renders the evidence legally insufficient to support the conviction (i.e. such variances are always material). Second, a variance involving a non-statutory allegation that describes an "allowable unit of prosecution" element of the offense may or may not render the evidence

11

legally insufficient, depending upon whether the variance is material (i.e. such variances are sometimes material). Finally, other types of variances involving immaterial non-statutory allegations do not render the evidence legally insufficient.

*Johnson v. State*, 364 S.W.3d 292, 298–99 (Tex. Crim. App. 2012).

In Russell's first variance claim, she argues that the State failed to show that she, as alleged in the information, interfered with Peron's duties by "walking through the intersections of Collins and Randol Mill." According to Russell, walking through the intersection may have been the act of an individual, but disrupting the flow of traffic in a way that could have constituted interference was necessarily the act of a group. But, as we have discussed, Russell was part of the group that was obstructing traffic, and Peron specifically identified her as one who was interfering with the ability of the officers to manage traffic. This interference was described by Peron as walking in a clockwise circle using the crosswalks at the intersection of Collins and Randol Mill, while at the same time failing to obey the traffic signals. Peron's testimony was sufficient to illustrate that Russell and the rest of the protesting group had walked through the intersection of Collins and Randol Mill and caused interference with the duties of Peron and the other officers. Thus, there was no variance between the language of the information and the proof at trial, material or otherwise.

Second, Russell complains of a material variance between the allegation that she stood in front of the entry gates and the proof at trial that she was part of a group that formed a "human chain." Again, however, there is no variance. Peron indeed

12

testified that the group (which included Russell) formed a human chain, and he made it clear that lines began to form, affecting the fans' ability to enter the stadium. A rational juror could infer from this testimony that the human chain necessarily blocked the gates, thus hindering the ability of the fans to get into the stadium. Contrary to Russell's argument, it is possible for an actor to be a member of a group (the other members of which are engaged in illegal conduct) and for that actor to participate in and commit the same illegal acts. That is, in fact, the substance of Peron's testimony. Therefore, there is no variance between the gate-blocking allegation in the information and the proof at trial.

## IV. CONCLUSION

We overrule Russell's four points on appeal, and we affirm the trial court's judgment.

/s/ Mike Wallach
Mike Wallach
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: April 7, 2022

13