

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00101-CR

———————————————

RANDY ALLEN GORDON, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 271st District Court
Wise County, Texas
Trial Court No. CR24630

---

Before Sudderth, C.J.; Birdwell and Wallach, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

Appellant Randy Allen Gordon appeals his conviction for evading arrest or detention with a vehicle, a third-degree felony offense with the sentence enhanced by two prior felony convictions and an affirmative finding of the use of a deadly weapon. *See* Tex. Penal Code Ann. § 38.04(a), (b)(2)(A). In two issues, Gordon contends that the evidence was insufficient to support (1) the elements of evading arrest or detention, namely, that he was aware that the officer was attempting to conduct a traffic stop, and (2) the finding that he used or exhibited a motorcycle as a deadly weapon or that he caused another person to be in actual danger of serious bodily injury or death by the manner in which he drove the motorcycle.

Because we conclude that the evidence was sufficient for a jury to reasonably find the essential elements of the offense beyond a reasonable doubt and to reasonably find that Gordon used or exhibited a deadly weapon, we affirm the trial court's judgment.

## I. Background

Department of Public Safety Trooper Robert Carson was working stationary patrol on February 12, 2023. He sat, facing southbound, in a "clearly marked patrol vehicle" on the side of FM 730 at the county line between Tarrant and Wise Counties. An orange motorcycle with a "mutilated" license plate was traveling northbound on FM 730. When Trooper Carson saw the motorcycle, he believed that he recognized it as the one that had run from him in the same exact area about a month prior, though

2

that motorcycle had been blue. Trooper Carson decided to follow the motorcycle to "see if maybe" it was the one that had run from him, so he began to make a "U-turn" toward the motorcycle as it passed him. When Trooper Carson began to move his patrol vehicle, he turned and observed the motorcycle "suddenly" make "an unsafe left turn" across traffic onto a two-lane, residential county road without using a turn signal, turning in front of another motorcycle traveling southbound.

Trooper Carson followed the motorcycle—driven by Gordon—onto the county road and activated his overhead lights and siren to conduct a traffic stop. Gordon turned back and looked at Trooper Carson twice before leaning forward over the handles of the motorcycle and accelerating to a high rate of speed. Trooper Carson accelerated to follow Gordon, and during the pursuit, he reached speeds of up to 80 to 90 miles per hour (mph) trying to catch up to Gordon, who was likely driving in excess of 90 mph. The speed limit on the county road was 40 mph. Trooper Carson testified that Gordon never attempted to yield or slow down in response to his lights and siren. During the four-mile pursuit, Gordon sped through several blind curves, sped past other vehicles traveling in the opposite direction, and drove into the oncoming lane of traffic to swerve around vehicles traveling in his lane; the other motorists stopped or pulled over to the side of the road.

Less than two minutes into the pursuit, Gordon "crashed out" as he approached a sharp curve in the roadway. The dash-camera video from Trooper Carson's patrol vehicle shows that another vehicle—a white truck—was also driving

3

around the curve at about the same time, near the vicinity of the crash. As Trooper Carson pulled up to the crash, he located Gordon's motorcycle lying on its side on the right side of the road. Gordon, however, "immediately began running"; he had run to the other side of the road and was attempting to jump a fence as Trooper Carson approached. Trooper Carson instructed Gordon to "get on the ground" and then placed him in custody. When Trooper Carson approached Gordon, Gordon asked, "Where did you come from?" Trooper Carson asked Gordon why he had run, and Gordon responded that "he had warrants."

Gordon was indicted for evading arrest or detention with a vehicle, a third-degree felony offense. The indictment contained two sentence-enhancement paragraphs alleging that Gordon had two prior felony convictions, and it included a deadly weapon finding notice alleging that Gordon had used a motor vehicle as a deadly weapon during the commission of the offense. After the jury convicted Gordon and made an affirmative deadly weapon finding, the trial court sentenced him to 42 years' confinement. This appeal followed.

## II. Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether a rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017); *see also Orlando v. State*, No. 02-22-00239-CR, 2023 WL 3251010, at

4

*2 (Tex. App.—Fort Worth May 4, 2023, pet. ref'd) (mem. op., not designated for publication) (applying *Jackson* standard when evaluating the sufficiency of the evidence to support a deadly weapon finding). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021).

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton*, 569 S.W.3d at 608. This standard of review is the same for direct- and circumstantial-evidence cases; circumstantial evidence is as probative as direct evidence establishing guilt. *Carter v. State*, 620 S.W.3d 147, 149 (Tex. Crim. App. 2021), *cert. denied*, 142 S. Ct. 859 (2022).

## III. Evading Arrest

In his first issue, Gordon argues that no rational trier of fact could have found beyond a reasonable doubt that he "intentionally or knowingly" evaded Trooper Carson's show of authority.

### A. Applicable Law

Under Section 38.04, "[a] person commits an offense if he intentionally flees from a person he knows is a peace officer or federal special investigator attempting lawfully to arrest or detain him." Tex. Penal Code Ann. § 38.04(a). That offense is a third-degree felony if the actor uses a vehicle while in flight. *See id.* § 38.04(b)(2)(A); *Williams v. State*, No. 02-19-00190-CR, 2020 WL 6326150, at *3 (Tex. App.—Fort Worth Oct. 29, 2020, no pet.) (mem. op., not designated for publication).

The elements of the evasion statute are (1) a person (2) intentionally flees (3) from a peace officer or federal special investigator (4) with knowledge he is a peace officer or federal special investigator (5) with knowledge the peace officer or federal special investigator is attempting to arrest or detain the person, and (6) the attempted arrest or detention is lawful. *Nicholson v. State*, 682 S.W.3d 238, 245 (Tex. Crim. App. 2024). Essentially, a person commits a crime under Section 38.04 if he knows a police officer is attempting to arrest or detain him but nevertheless refuses to yield to a lawful show of authority. *Williams*, 2020 WL 6326150, at *3. A jury may infer knowledge from circumstantial evidence, such as the acts, words, and conduct of the

defendant. *Id.* (citing *Reyes v. State*, 480 S.W.3d 70, 77 (Tex. App.—Fort Worth 2015, pet. ref'd)).

**B. Analysis**

Gordon challenges only one element of the offense: his awareness that Trooper Carson was attempting to make a traffic stop. We conclude that the evidence supports the jury's inference of Gordon's awareness and intent to evade Trooper Carson's show of authority. The record is replete with evidence indicating Gordon's cognizance that Trooper Carson was attempting to stop or detain him as he sped away from the officer and then tried to flee on foot:

- Trooper Carson's "clearly marked patrol vehicle" was on the side of the road (facing southbound) when Gordon drove toward him from the opposite direction (traveling northbound), which can be seen on the dashcam video. Gordon remained in the frame of the dashcam video—looking at Trooper Carson from approximately fifteen feet away—until *after* Trooper Carson's vehicle had already entered the road to make a U-turn. In other words, the video shows that Trooper Carson began to move his vehicle to make a U-turn *before* Gordon "suddenly" made "an unsafe left turn" onto the county road without using a turn signal—a traffic violation.[1]

- Trooper Carson followed Gordon onto the county road and activated his overhead lights and siren.[2]

---

[1] *See Thorn v. State*, No. 01-13-00906-CR, 2014 WL 3512811, at *4 (Tex. App.—Houston [1st Dist.] July 15, 2014, pet. ref'd) (mem. op., not designated for publication) (stating sudden departure upon presence of officer is circumstantial evidence supporting conviction); *see also* Tex. Transp. Code Ann. § 545.104 (requiring turn signals).

[2] *See Easter v. State*, No. 05-19-00398-CR, 2020 WL 3424950, at *2 (Tex. App.—Dallas June 23, 2020, no pet.) (mem. op., not designated for publication) ("Evidence that a peace officer is asserting authority and attempting to arrest or detain an

- Gordon turned and looked at Trooper Carson twice before leaning forward over the motorcycle and accelerating to high speeds—at least 80 and 90 mph on a county road with a speed limit of 40 mph. He never attempted to yield or slow down in response to Trooper Carson's lights and siren.[3]

- The dashcam video shows that when Gordon sped off, Trooper Carson accelerated to follow him and that at times during the pursuit, Trooper Carson was able to catch up to him. Based on their relative positions and the volume of Trooper Carson's siren, which can be heard on the video, the jury could infer that Gordon could not have failed to hear the siren, particularly when there is no evidence that he was unable to hear the siren.[4]

- The dashcam video shows that other vehicles stopped or pulled over as Trooper Carson approached with his lights and siren activated.[5]

- Gordon lost control of the motorcycle and "crashed out" and then "immediately began running," attempting to jump over a fence as Trooper Carson approached him.[6]

---

individual includes the use of emergency lights and sirens."); *Perry v. State*, No. 02-19-00262-CR, 2020 WL 479590, at \*5 (Tex. App.—Fort Worth Jan. 30, 2020, pet. ref'd) (mem. op., not designated for publication) (similar).

[3]*See Perry*, 2020 WL 479590, at \*5 (inferring defendant's intent to evade from the speed, distance, and duration of pursuit); *Thorn*, 2014 WL 3512811, at \*5 (holding evidence sufficient to support conviction when appellant "accelerated to a high rate of speed"); *see also Sanders v. State*, No. 02-11-00091-CR, 2012 WL 2579542, at \*3 (Tex. App.—Fort Worth July 5, 2012, no pet.) (per curiam) (mem. op., not designated for publication) (upholding conviction where appellant violated traffic laws "while pursued by a police car with flashing lights and sirens").

[4]*See Williams*, 2020 WL 6326150, at \*3 (reaching same conclusion on similar facts); *cf. Pool v. State*, No. 02-12-00640-CR, 2013 WL 4716019, at \*5 (Tex. App.—Fort Worth Aug. 30, 2013, pet. ref'd) (per curiam) (mem. op., not designated for publication) (concluding appellant could not have heard officer's siren based on evidence that appellant had a hearing problem).

[5]*Cf. Pool*, 2013 WL 4716019, at \*5 (contrasting evidence that other drivers appeared to ignore the officer's lights and siren).

- When Trooper Carson asked Gordon why he ran, Gordon responded that he had warrants, which demonstrated consciousness of pursuing law enforcement and, along with Gordon's traffic violations, provided a motive to flee.[7]

According to Gordon, the dashcam video does not support Trooper Carson's testimony about exactly when he activated his overhead lights and siren and when Gordon looked back at him. But the jury, as factfinder, viewed the video and heard the testimony firsthand. We presume that the factfinder judged the weight of the evidence and the credibility of the testimony and resolved any conflicts therefrom, and we defer to the jury's resolution. *See Braughton*, 569 S.W.3d at 608.

Viewing the evidence and any reasonable inferences in the light most favorable to the verdict, we conclude that the jury could have found beyond a reasonable doubt

---

[6]*See Perry*, 2020 WL 479590, at *2 (upholding conviction where appellant got out of vehicle and began to run); *Parks v. State*, Nos. 02-13-00570-CR, 02-13-00571-CR, 2014 WL 4105294, at *2 (Tex. App.—Fort Worth Aug. 21, 2014, no pet.) (per curiam) (mem. op., not designated for publication) (holding evidence sufficient when officer, with activated lights and siren, pursued defendant while defendant drove recklessly at 100 mph, lost control of car, wrecked, and then attempted to continue fleeing on foot); *Miller v. State*, No. 05-03-00488-CR, 2004 WL 1434549, at *2 (Tex. App.—Dallas June 28, 2004, no pet.) (mem. op., not designated for publication) (upholding conviction where appellant fled from police on a motorcycle, crashed, and then tried to escape on foot).

[7]*See Williams*, 2020 WL 6326150, at *3 (describing appellant's violations of Texas Transportation Code as motive to flee); *Perry*, 2020 WL 479590, at *9 ("Appellant's own words conclusively demonstrate a motive to flee."); *Sanders*, 2012 WL 2579542, at *3 (explaining that appellant's not wanting to be apprehended for another offense provided motive to flee); *see also Vital v. State*, Nos. 2-02-421-CR, 2-02-422-CR, 2003 WL 22966375, at *2 (Tex. App.—Fort Worth Dec. 18, 2003, no pet.) (mem. op., not designated for publication) (noting that appellant's "motive for fleeing the police" was "highly probative" in establishing his culpable mental state).

that Gordon was aware of Trooper Carson's show of authority and that he intentionally evaded the officer. We overrule Gordon's first issue.

## IV. Deadly Weapon

In his second issue, Gordon argues that "[n]o rational trier of fact could have found, beyond a reasonable doubt," that he used or exhibited his motorcycle as a deadly weapon or that he caused another person to be in actual danger of serious bodily injury or death by the manner in which he drove the motorcycle.

## A. Applicable Law

By statute, a motor vehicle is not a deadly weapon per se, but it can be a deadly weapon if its "manner of . . . use or intended use is capable of causing death or serious bodily injury." Tex. Penal Code Ann. § 1.07(17)(B); *Couthren v. State*, 571 S.W.3d 786, 789 (Tex. Crim. App. 2019). A vehicle is not capable of causing death or serious bodily injury unless its manner of use presents an "actual danger" of causing such harm. *Drichas v. State*, 175 S.W.3d 795, 799–800 (Tex. Crim. App. 2005).

To determine whether the evidence shows sufficiently that a vehicle was used as a deadly weapon, we use a two-part test: "first, we evaluate the manner in which the defendant used the motor vehicle during the felony; and second, we consider whether, during the felony, the motor vehicle was capable of causing death or serious bodily injury." *Sierra v. State*, 280 S.W.3d 250, 255 (Tex. Crim. App. 2009).

## B. Analysis

### 1. Gordon's Manner of Driving

10

Under the first part of the *Sierra* test, we must evaluate whether Gordon's manner of driving was reckless or dangerous. *See id.*; *Orlando*, 2023 WL 3251010, at *2. In doing so, we consider several factors: (1) intoxication, (2) speeding, (3) disregarding traffic signs and signals, (4) driving erratically, and (5) failure to control the vehicle. *See Orlando*, 2023 WL 3251010, at *2.

Here, the evidence is sufficient to support a finding that Gordon's driving was reckless or dangerous. Specifically, Gordon was speeding, drove erratically, and failed to control his motorcycle. Trooper Carson testified that Gordon's speed reached up to at least 90 mph on a county road with a speed limit of 40 mph. Gordon's erratic driving and inability to control his motorcycle were clearly demonstrated by testimonial and video evidence showing that he sped around blind curves on a residential county road, that he entered the oncoming lane of traffic and sped around other vehicles on the road, and that he eventually crashed the motorcycle. A rational factfinder thus could have found, beyond a reasonable doubt, that Gordon's driving was reckless or dangerous. *See Sierra*, 280 S.W.3d at 256 ("[A] jury could reasonably find that [appellant] was speeding and failed to maintain control of his SUV."); *Orlando*, 2023 WL 3251010, at *2 (concluding appellant drove erratically and failed to control vehicle where he "backed into one car, hopped a curb, hit another parked car, and then crashed into a tree").

## 2. Whether the Motorcycle Was Capable of Causing Death or Serious Bodily Injury

Under the second part of the *Sierra* test, we must determine whether Gordon's use of his motorcycle was capable of causing death or serious bodily injury. To support a deadly weapon finding, the record must show more than a hypothetical potential for danger. *Moore v. State*, 520 S.W.3d 906, 909 (Tex. Crim. App. 2017); *Orlando*, 2023 WL 3251010, at *3. Rather, there must be evidence that others were actually endangered. *Orlando*, 2023 WL 3251010, at *3. This does not, however, require evidence of actual bodily injury or vehicle damage, nor does it require evidence that Gordon intended to cause such injury or damage. *See Moore*, 520 S.W.3d at 908, 913; *Mayo v. State*, No. 02-19-00404-CR, 2021 WL 2587065, at *6–7 (Tex. App.—Fort Worth June 24, 2021, no pet.) (mem. op., not designated for publication). For example, "a deadly weapon finding is appropriate on a sufficient showing . . . that another motorist was on the highway at the same time and place as [Gordon] when [he] drove in a dangerous manner." *Drichas*, 175 S.W.3d at 799.

Here, the record clearly shows that there were other motorists on the road "at the same time and place" as Gordon. *See id.* Before he turned onto the county road, Gordon "suddenly" made "an unsafe left turn" without a turn signal, turning directly in front of another motorcycle. While on the county road, Gordon passed other motorists at speeds of up to 90 mph, drove into the oncoming lane of traffic, and swerved around other vehicles that had stopped or pulled over to the road's shoulder. Gordon concedes that he crossed the center line into oncoming traffic but asserts that "there were very few, if any, cars in that lane." "The volume of traffic on the road is

12

relevant only if no traffic exists," *id.*, and the facts of this case are that Gordon sped past or swerved around four vehicles, including a FedEx delivery truck, before crashing his motorcycle. Further, the jury could infer from the dashcam video that Gordon crashed because he unsuccessfully tried to swerve around a white truck as they approached a curve in the roadway at the same time. The volume of traffic is therefore irrelevant. *See id.*; *see also Moore*, 520 S.W.3d at 909–10 (upholding deadly weapon finding where "some" traffic was present on road during pursuit).

Trooper Carson testified that pursuits, "by their nature," are dangerous for the defendant, the pursuing officers, and other motorists or pedestrians. Relying on his experience and training, Trooper Carson opined that based on the way Gordon was driving his motorcycle and the type of roadway, he was operating his motorcycle as a deadly weapon. Indeed, Gordon drove his motorcycle at extremely high speeds—at least 90 mph—on a residential county road. He sped around blind curves, drove into the oncoming lane of traffic, and swerved around other vehicles, which had to stop or pull over to avoid both him and Trooper Carson, before losing control and crashing his motorcycle—in the vicinity of another motorist. Moreover, the evidence shows that Gordon's driving during the pursuit placed Trooper Carson, whose vehicle reached 90 mph on a residential county road while swerving around other traffic to catch up to Gordon, in actual danger. *See Bedford v. State*, No. 02-15-00176-CR, 2016 WL 5220068, at *4 (Tex. App.—Fort Worth Sept. 22, 2016, no pet.) (mem. op., not

designated for publication) (noting that police officers should not be excluded from class of persons capable of being endangered by driver of fleeing vehicle).

We conclude that the evidence was sufficient to support a finding that Gordon's reckless or dangerous driving actually endangered others. *See Drichas*, 175 S.W.3d at 798 (holding appellant's driving on wrong side of highway posed a danger to pursuing officers and other motorists); *Mayo*, 2021 WL 2587065, at \*7 (upholding deadly weapon finding where appellant's speeding and aggressive driving were "capable of causing a wreck"); *Govea v. State*, No. 02-16-00368-CR, 2017 WL 3429144, at \*1–4 (Tex. App.—Fort Worth Aug. 10, 2017, pet. ref'd) (mem. op., not designated for publication) (upholding deadly weapon finding where defendant led officer on a high-speed chase, drove over 100 mph, and passed vehicles on the shoulder); *Bedford*, 2016 WL 5220068, at \*3–4 (upholding deadly weapon finding where defendant initiated high-speed chase in residential neighborhood and placed pursuing officers in actual danger of death or serious bodily injury).

### 3. Resolution

Viewing the evidence and any reasonable inferences in the light most favorable to the verdict, we conclude that the jury could have found beyond a reasonable doubt that the manner in which Gordon drove his motorcycle during the felony placed others in actual danger of death or serious bodily injury. We overrule Gordon's second issue.

14

## V. Conclusion

Having overruled Gordon's two appellate issues, we affirm the trial court's judgment.

/s/ Wade Birdwell

Wade Birdwell
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: May 30, 2024